# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## THE FEDERAL LAND BANK OF BALTIMORE, AND ANOTHER v. THOMAS E. JOYNES, AND OTHERS.

March 2, 1942.

Record No. 2449.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Spratley, JJ.

The opinion states the case.

*Benjamin W. Mears, C. C. Seymour, Peyton G. Jefferson* and *Clarence A. Patterson* (Baltimore, Md.), for the appellants.

*J. Brooks Mapp* and *William King Mapp*, for the appellees.

GREGORY, J., delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Northampton county adjudicating priority of liens and denying a claim of the appellants to subrogation.

The suit was instituted by Mrs. Emma K. Joynes for the purpose of enforcing an equitable lien upon a certain 87.86 acre tract of land situate in Northampton county. The lien secured an annuity of $700 to her. The appellants filed their answer and cross-bill in the court below wherein they claimed subrogation to the superior lien of a prior creditor.

The record contains many facts that are not material in our consideration of the case. We will not advert to what we deem are nonessential facts. Those that are essential are not in dispute and are as follows: Prior to 1915, Emma Joynes and her two sons, Thomas and Garnett, held the 87.86 acre tract here involved as tenants in common. By deed dated February 15, 1915, Emma conveyed all her interest, which was one-third, to Thomas and Garnett, who owned a two-thirds interest, and promised to pay her an annuity of $700 each year. She retained a lien on her one-third interest in the tract of land, and Thomas and Garnett

granted a lien on their two-thirds to secure payment of said annuity. The liens were expressed as follows:

"As a part of the consideration for the aforesaid conveyance, the said Thomas E. Joynes and Garnet R. Joynes, covenant and agree for themselves, their heirs and assigns, to pay to the said Emma K. Joynes during her life the sum of Seven Hundred Dollars ($700.00) each and every year on the thirty-first day of December, the same being testified to by their becoming parties to and signing and sealing this deed, and to secure the said annuity to the said Emma K. Joynes during each year of her life a lien is hereby retained by the said Emma K. Joynes on the first above described real estate and a further lien is hereby given by the said Thomas E. Joynes and Garnet R. Joynes on their respective interest in the first above described tract of land, their interest in said tract being a two-thirds interest under the will of the late William W. Joynes. It is the intention of this agreement that the said Emma K. Joynes shall have a lien on the entire tract of land of eighty-seven and one-half acres to secure the payment of said annuity so long as she shall live."

In 1925 Thomas and Garnett executed a deed of trust which conveyed the said tract (along with other land not material here), to secure the Virginian Joint Stock Land Bank payment of $22,500. Emma Joynes joined in this deed for the purpose of subordinating her liens which secured the $700 annuity payments.

In 1933 the payments on the joint stock bank loan were delinquent, and that bank was threatening foreclosure. Mrs. Emma Joynes had made her home since 1915 with Thomas on the said tract of land. Thomas and Garnett applied to the Federal Land Bank and the Land Bank Commissioner for loans which were finally closed with the bank in the amount of $12,000 and with the Commissioner in the amount of $5,000. The bank's loan was secured by a mortgage, whereas the loan of the Federal Farm Mortgage Corporation (represented by the Land Bank Commissioner), was secured by a deed of trust. In their application Thomas and Garnett

stated that one of the purposes of the said loan was to pay the amount due the Virginian Joint Stock Land Bank. They agreed, in the application, to give the appellant bank and corporation a first and second lien, respectively. They were required to list all lien debts against the property, but failed to include the claim of Emma Joynes.

In order to close the loans of the bank and corporation, it was required that all existing liens be released. This necessitated a scaling down of the debts of the Joyneses by means of creditor's agreements. Through such an agreement the debt owing the Virginian Joint Stock Land Bank was reduced from a figure in excess of $16,000 to $13,000.

Before the closing of the loans the attorney who prepared the abstract of title discovered the existence of Mrs. Joynes' liens. He testified that Thomas advised him that Emma Joynes would join in the mortgage and deed of trust. The abstract containing the information concerning Mrs. Joynes' liens was then sent to the bank's Baltimore office, where the documents were prepared. Through inadvertence and oversight the Baltimore office failed to require Mrs. Joynes to subordinate her liens, and the loans were thus consummated. The proceeds of the loans were then used to pay off, among other indebtedness, the debts owing the Virginian Joint Stock Land Bank and the taxing authorities.

In 1939 Thomas and Garnett Joynes were adjudged bankrupt and granted discharges. Subsequently, in 1940, Emma K. Joynes filed a bill in chancery for the purpose of establishing the amount due her on the annuity and to declare in her favor a first lien against the 87.86 acre tract of land, subordinate only to taxes then due. She also made the appellants parties defendant. Thomas was appointed committee for his mother, who was too feeble and aged to testify.

The bank and corporation answered and filed a cross-bill. They asked for affirmative relief, namely, that they be subrogated to the rights of the taxing authorities to the extent of taxes paid from the proceeds of said loans, and to the rights of the Virginian Joint Stock Land Bank and be given a prior lien on the 87.86 acre tract for the $13,000 actually furnished to satisfy the first lien.

A decree of reference was made whereby the cause was referred to a special commissioner who heard evidence thereon. During the taking of the evidence, Emma K. Joynes died testate, naming Thomas and Garnett Joynes executors of her will, and the original suit proceeded in their names as executors of the estate of Emma Joynes. The commissioner made his report and the court, acting thereon, entered a decree which denied the subrogation of appellants to a first lien on said tract, and declared a lien on the property after taxes in favor of the estate of Emma Joynes in the amount of the unpaid annuities of approximately $12,000. From this decree the appellants have appealed.

The sole question for determination is whether the appellant bank and corporation should be subrogated to the lien of the Virginian Joint Stock Land Bank and the taxing authorities.

There can be no doubt but that the bank and corporation intended to obtain a first and second lien respectively. In fact, under the statute (12 U. S. C. 771), the bank could take only a first lien as security.

Subrogation is the substitution of another person in the place of the creditor to whose rights he succeeds in relation to the debt. This doctrine is not dependent upon contract, nor upon privity between the parties; it is the creature of equity, and is founded upon principles of natural justice. See *Hudson* v. *Dismukes*, 77 Va. 242, 246. It was first applied only in the case of sureties, but through a process of liberalization its scope of application has been enlarged.

Subrogation has been generally classified as being either legal or conventional. Legal subrogation arises by operation of law where one having a liability, or right, or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid. Conventional subrogation, on the other hand, arises where by express or implied agreement with the debtor, a person advancing money to discharge a prior lien might be substituted to the security of the prior lienee. The progressive

extension of both types of subrogation has somewhat obliterated this line of division. See 70 A. L. R. 1396, 1397.

The rationale of legal subrogation is bottomed on a sensitivity to the comparative equities involved. Where one is more fundamentally liable for a debt which another is obligated to pay, such person shall not enrich himself by escaping his obligation. In the case of conventional subrogation where the lender of money lent it with the intention and understanding that he be substituted to the position of the creditor whose debt he paid, but without taking an assignment, where there are no intervening equities to be prejudiced, the matter will be treated as if an assignment has been executed. See *Martin* v. *Hickenlooper*, 90 Utah 150, 59 P. (2d) 1139, 107 A. L. R. 762.

In 25 R. C. L. 1322, 1323, appears this cogent statement: "Since the doctrine of subrogation was ingrafted on English equity jurisprudence, it has been steadily expanding and growing in importance and extent in its application to various subjects and classes of persons. The original limitation of the right to transactions between principals and sureties no longer exists, and the doctrine as now applied is broad enough to include every instance in which one person, not acting voluntarily, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter. Subrogation not being a matter of strict right, but purely equitable in its nature, dependent upon the facts and circumstances of each particular case, no general rule can be laid down which will afford a test in all cases for its application. * * *"

Virginia has long been committed to a liberal application of the principle of subrogation. See *Sands' Adm'r* v. *Durham*, 99 Va. 263, 38 S. E. 145, 86 Am. St. Rep. 884, 54 L. R. A. 622, where Judge Whittle says at p. 267:

"In no other jurisdiction has the doctrine been more firmly adhered to or more liberally expounded and applied, to meet the exigencies of particular cases, than in Virginia."

The weight of authority and the modern cases support the view that subrogation is generally allowed where

the loan was made by one who took a security from the borrower which turned out to be invalid. See *Morgan* v. *Gollehon*, 153 Va. 246, 250, 149 S. E. 485.

An examination of the specific holdings in particular cases is illuminative of the breadth of the application of subrogation.

In *Cooper* v. *Home Owners' Loan Corp.*, 197 Ark. 839, 126 S. W. (2d) 112, the loan corporation in good faith liquidated an existing valid vendor's lien on realty owned by husband and wife by entirety at the instance of the husband and at a time when the wife was insane. It was held that the loan corporation was not a mere "volunteer" and was subrogated to the rights of the vendor, and, subject to the wife's right to redeem, could foreclose the lien against the wife who was subsequently declared to be sane.

In *Bankers' Loan, etc., Co.* v. *Hornish*, 94 Va. 608, 27 S. E. 459, the loan company advanced money to pay off notes given for the purchase price of real estate secured by a first deed of trust thereon and stipulated that it was to have a first lien. The notes were taken in uncancelled. The court held that the lender was entitled to be subrogated to the rights of the holder of said notes and had priority over intervening judgment creditors of the grantor.

However, contractual subrogation does not depend upon a formal transfer of the instruments evidencing the original indebtedness. *Glasscock* v. *Travelers Ins. Co.* (Tex. Civ. App.), 113 S. W. (2d) 1005.

And in *Kaminskas* v. *Cepauskis*, 369 Ill. 566, 17 N. E. (2d) 558, conventional subrogation as against a debtor's widow's dower claim was held to have resulted from an equitable right springing from an express agreement with the debtor by which one advanced money to pay a claim for the security of which there existed a lien, and by such agreement he was to have an equal lien to that paid so as to receive the benefit of the security which he had satisfied with the expectation of receiving an equal lien.

[  ] Counsel for the appellees argue that in the instant case the appellants have forfeited any rights they might have

had to subrogation by their negligence in not availing themselves of the information contained in the abstract of title relative to Mrs. Joynes' equitable lien. It is true that some cases qualify the granting of subrogation by requiring that the subrogee be not chargeable with culpable or inexcusable neglect. See *McCollum* v. *Lark*, 187 Ga. 292, 200 S. E. 276. But the negligence of the subrogee must be more than ordinary negligence to bar the application of subrogation. Furthermore, the negligence should be chiefly of significance when there are subsequently intervening rights involved which would be prejudiced if subrogation were allowed.

Thus, a party advancing money to discharge a prior lien who does not search the records to discover other liens, but who relies, for example, on the borrower's assurances that there are no other liens is not barred from his right of subrogation as against a junior encumbrancer who is not prejudiced. *Morgan* v. *Gollehon, supra; Huggins* v. *Fitzpatrick*, 102 W. Va. 224, 135 S. E. 19; *Jackson Trust Co.* v. *Gilkinson*, 105 N. J. Eq. 116, 147 A. 113.

In *Hoagland & Co.* v. *Decker*, 118 Neb. 194, 224 N. W. 14, the lender advanced money to pay off a first mortgage, upon an agreement that he would have a first lien on the property to secure his loan. He was on notice that some construction was taking place on the premises and demanded that the liens of materialmen be released so as not to jeopardize his first lien. The owner failed to procure the release of these liens, and through mischance the loan was consummated without procuring them. The proceeds of the loan were in fact utilized to pay off the prior first mortgage. The court held that it was the intention of the lender to obtain a first mortgage and that, accordingly, he would be subrogated to the security of the prior mortgagee.

In *Martin* v. *Hickenlooper, supra,* a trust company owned some property subject to outstanding first and second mortgages. The trust company borrowed money from Mrs. Zorn, representing that she was to obtain a first lien. An abstract of title was furnished Mrs. Zorn, but she never examined it. The money loaned by her was used to pay off the first mortgage, which was released. In a dispute over

priority of claims between the second mortgagee and Mrs. Zorn, wherein the court made an exhaustive review of the authorities, it was held that Mrs. Zorn was entitled to be subrogated to the lien of the first mortgagee.

Although appellants were guilty of negligence in the instant case, they are not barred from subrogation on that ground alone. An examination of the facts of this particular case shows that the equities strongly favor them.

The equities referred to grow out of facts that existed at the time the suit was instituted as well as those that have developed during the progress of the litigation. Thomas and Garnett Joynes gave the land bank a mortgage and the bank commissioner a deed of trust securing the respective amounts loaned by them. In those instruments they conveyed the 87.86 acre tract with general warranty of title and with the Virginia statutory covenants. The legal effect of these is expressly set forth in Michie's Code, sections 5171 to 5177, inclusive. The covenantors, by their covenants, agreed to warrant and defend the title against all the world, and they also covenanted that they had done no act to encumber the title to the tract. At the very time the covenants were made they had already placed a prior lien on the tract to secure their mother an annuity of $700 per annum. Thus, their covenant that they had done no act to encumber the tract was untrue and violated.

Thomas and Garnett Joynes later filed their petitions in bankruptcy, listing their mother, the beneficiary of the annuity, as a creditor, having defaulted in their payments to her for many years and in a large sum. Still later they obtained their discharges. Afterwards, their mother, Mrs. Emma Joynes, died testate leaving one-half of her estate to Thomas Joynes for life with remainder to his wife, and the other half to Garnett for life with remainder to his children, providing in the will that the life estates of her two sons should not be available for any of their debts. As conceded by counsel, practically all of her estate at her death consisted of the annuity, which at that time amounted to approximately $12,000. Thomas and Garnett were named executors, and this suit from that time has been conducted in their names as

executors against themselves as individual defendants along with the land bank and others. They are in fact the real plaintiffs because, if they, as executors, prevail in the assertion of their present claim, a large portion, to wit, at least one-half of the total annuity payments, will be distributed to them as life tenants under the will from proceeds of the property, the title to which they warranted to defend against all claims and demands, and which they covenanted was free of encumbrances.

Thomas and Garnett are in reality both plaintiffs and defendants. This is conceded by Thomas. The decree in its result permits them to acquire their own lien obligation by devise and to enforce it against land they had warranted generally.

Generally the acquisition of a mortgage by the mortgagor extinguishes the mortgage. This is especially true when its enforcement would prejudice the rights of other creditors as is the case here. *Allen* v. *Patrick*, 97 Va. 521, 34 S. E. 451. Here, in final analysis, "the hand that is to receive is the hand to pay" to the extent of the life estate which according to the ages of Thomas and Garnett and Code, section 5131, amounts to more than $6,000.

Even if we were to deny subrogation in this case, in no event would the court countenance the injustice of allowing Thomas and Garnett to enjoy a life estate, under their mother's will, in a fund, coming from the proceeds of the 87.86 acres, which they themselves had previously agreed to pay to her during her lifetime but had failed to pay. This would in effect be to require the appellants to pay Thomas and Garnett the annuities. They would be estopped by their covenants and the conscience of a court of equity to assert such a claim to the prejudice of the appellants.

We must look to the realities of the situation as they existed at the time of the decree. 19 Am. Jur., Equity, section 411.

It happens that no one will be prejudiced by the application of the doctrine of subrogation here. Even if Mrs. Joynes were still living her interests would not be

prejudiced. In fact, they would be promoted because her annuity would be inferior only to a lien for $13,000, while originally it was inferior to one much larger, to wit, $16,000. Thomas and Garnett Joynes will not be hurt because whatever benefit would accrue to them from the proceeds of the 87.86 acre tract in satisfaction of the claim to the annuities should, in good conscience and justice, inure to the benefit of their covenantees, the appellants. In addition they are conclusively estopped by their covenants to resist the appellants' claim to subrogation or to make any claims, as against the appellants, to any participation in the annuities that may be paid from the 87.86 acres or its proceeds.

The remaindermen in the will of Mrs. Joynes could take only such estate as Mrs. Joynes had to dispose of and inasmuch as subrogation in favor of the appellants became effective at the time they paid off the first lien, and during the life of Mrs. Emma Joynes, the estate she had to devise was subject to the subrogation. Furthermore, in consideration of the comparative equities as between the remaindermen and the land bank, the devisees are gratuitous donees, while the land bank is a *bona fide* creditor for value with rights fixed prior to those of the remaindermen.

The ultimate *onus* of discharging the debt should equitably rest upon the two principal debtors, namely, Thomas and Garnett Joynes. Since the underlying purpose of subrogation is to accomplish this just end by lending the benevolent aid of equity in curing technical defects caused by mistakes or inadvertence, we conclude that the case at bar rightly demands the application of that doctrine.

It is argued that to apply the doctrine of subrogation here would result in making a new contract for Mrs. Joynes; that the time of payment of the obligation to which she agreed to subordinate her lien would be greatly extended, and thus prejudice her rights.

When the Federal Land Bank and the Land Bank Commissioner are subrogated to the lien of the deed of trust which secured the Virginian Joint Stock Land Bank they step into the shoes of the latter bank in so far as the latter bank's

lien is concerned. They succeed to all the rights of their predecessor in that lien. Now when Mrs. Joynes signed the deed waiving the priority of her lien to that of the deed of trust, she knew that the Virginian Joint Stock Land Bank might exercise one or all of the incidents of ownership over its obligation; she knew that the obligation might be assigned, in which event the lien of the deed of trust would follow the evidence of the obligation and that it would be a first lien securing that obligation in the hands of an assignee. Likewise she must have also known that a situation might develop whereby the application of the doctrine of subrogation might arise which would operate just as an assignment of the deed of trust obligation and which would give the subrogee like priority over her lien.

The waiver applied not only to the deed of trust lien in favor of the Virginian Joint Stock Land Bank but also in favor of any one that might succeed to its rights, whether it be by assignment or by the operation of the doctrine of subrogation. The waiver was not personal to the Virginian Joint Stock Land Bank. This is clear from the express language of the waiver: "Subject only to this deed of trust, which is hereby given priority, the annuity reserved shall remain intact." Thus it is obvious that it applied to the deed of trust and not to any particular person. It applied to any person or corporation succeeding to the rights of the Virginian Joint Stock Land Bank.

Reduced to simple terms, in effect we have a case where there are senior and junior mortgages. At the request of the holder of the senior mortgage the appellants advanced the money to satisfy the obligation secured under that mortgage with the intent of both parties that the appellants would have a first mortgage. Through their own negligence, which has prejudiced no one's rights, they failed to procure a first mortgage. A court of equity under such circumstances and in view of the prevailing equities in their favor will keep alive the senior mortgage and allow the appellants to be subrogated thereto.

The cause is therefore reversed and remanded with directions to subrogate the appellants to the valid liens on the

said 87.86 acre tract which had existed in favor of the Virginian Joint Stock Land Bank and the taxing authorities, to the extent of the amount actually used to pay off those claims, and to decree the lien of appellees to be subordinate thereto.

*Reversed and remanded.*

SPRATLEY, J., dissenting.

Mr. Justice Hudgins and I are unable to concur in the disposition of this appeal in view of what we consider to be the controlling facts of the controversy.

Subrogation, purely a creature of equity, is peculiarly dependent upon the facts and circumstances of each particular case. The record contains material and pertinent facts not mentioned, and apparently not considered, in the majority opinion.

In 1915, Mrs. Joynes, by the conveyance to her sons of her one-third share in the 87 acre tract, paid full value for the $700 annuity secured to her by a vendor's lien on that entire tract.

Thomas E. and Garnett R. Joynes owned several parcels of land. They gave deeds of trust on their land, including the 87 acres, in 1920 and 1922, securing loans for the respective sums of $20,500 and $22,500. Their mother did not join in these deeds of trust nor waive her lien against the 87 acres.

In 1925, the sons borrowed $22,500 from the Shenandoah Valley Joint Stock Land Bank, using the proceeds to pay the debts against their lands. The last loan, secured by a deed of trust, was payable in forty semi-annual payments of $973.58 each. The last payment was to become due December 1, 1945.

Mrs. Joynes united in the deed of trust securing this debt. Her purpose in becoming a party thereto is clearly stated by the following provision in the deed of trust:

"Emma K. Joynes unites in this deed for the purpose of subordinating the $700.00 annuity reserved to her in the con-

veyance of her undivided one-third interest in 87.86 acres to Thomas E. Joynes and Garnett R. Joynes, dated February 17, 1915, by deed of record in D. B. No. 70, page 344, and *for no other purpose; subject only to the lien of this deed of trust, which is* hereby given priority, the *annuity reserved shall remain intact."* (Italics added.)

She assumed no obligation to pay the above debt to the Shenandoah Valley Joint Stock Land Bank. The extent of her agreement was that in the event the debt was not paid as it matured and a sale of the 87 acre tract became necessary to discharge the obligation, then so much of the proceeds of such sale as might be required to discharge the obligation should be used for that purpose. The balance of the proceeds would necessarily be applied to the payment of her annuity.

On May 14, 1934, the sons executed a mortgage on their lands, including the 87 acre tract, to secure $12,000, payable to the Federal Land Bank. This debt was payable in seventy-one semi-annual installments of $360 each and a final installment of $558.73, due November 14, 1970. On the same day they executed a deed of trust on the identical lands to secure the Land Bank Commissioner a $5,000 bond, payable in fifty-nine semi-annual installments of $83.33 each, the last to become due on May 1, 1967. This mortgage and this deed of trust are held by the appellants.

Mrs. Emma J. Joynes did not join in either the above mortgage or deed of trust; she did not sign the notes or bonds secured thereby; nor did she, in any manner, release or waive her annuity lien against the 87 acres.

Of the total sum of $17,000 borrowed, $13,000 was used in a compromise settlement of the balance due the Shenandoah Valley Joint Stock Land Bank under its deed of trust of December 1, 1925; $514.70 was applied to taxes against the two farms; and the remaining $3,485.30 was used in settlement of other judgments and claims, against Thomas and Garnett Joynes, which were subordinate to the annuity lien of Mrs. Joynes. Mrs. Joynes did not receive one penny from the proceeds of the two loans.

On the date the above mortgage and deed of trust were executed, the liens of record against the land of the two sons, amounting to $29,865.43, were as follows: (1) Taxes, $514.70; (2) Balance due Shenandoah Valley Joint Stock Land Bank, $16,575.21; (3) Past due annuities of Mrs. Joynes, secured by liens against the 87 acres, $7,193.03; (4) Judgment in favor of Northampton Lumber Company, dated November 19, 1929, $2,666.34; (5) Judgment in favor of Northampton Lumber Company, dated January 1, 1932, $892.22; and, (6) Judgment of the Worcester Fertilizer Company, $2,077.23.

Before making the $12,000 and $5,000 loans, the appellants, through their local committee in Northampton county, had both of the farms appraised. The buildings on the two farms were valued at $15,550 and the land at $33,297.90. The committee reported that, "In our judgment the present sale price of the property is $48,847.90," and recommended the grant of a loan not to exceed $19,700.

Loans of the Federal Bank were restricted to 50% of the appraised value of land, exclusive of buildings, and to 20% of the appraised value of buildings. The recommended loan of $19,700, therefore, meant that the value of the farms was in excess of $39,000, an amount sufficient to cover the taxes, the liens against the lands, and the unpaid annuities due Mrs. Joynes. Mrs. Joynes' lien was subordinate to only two items, the taxes and the unpaid balance due the Shenandoah Valley Joint Stock Land Bank.

The vendor's lien was a matter of record. All of the liens were reported by the appellants' local attorney to the Federal Land Bank in his abstract of title to the 87 acres. In his report, that attorney specifically referred to the deed of February 17, 1915, creating the lien in favor of Mrs. Joynes and stated that Mrs. Joynes was living, and that it was necessary for her to unite in the instruments securing the loans. He quoted in full the waiver of Mrs. Joynes in the 1925 deed of trust and recommended that the language of the waiver be used in the new papers.

Notwithstanding the above fact, appellants did not request Mrs. Joynes to release or subordinate her lien to the liens

obtained by them from her two sons. They had the mort-gage and deed of trust prepared in their Baltimore office. These instruments contain no reference whatever to Mrs. Joynes, to her lien, or to any waiver by her. They were returned to the local attorney, executed by the makers as prepared, and duly recorded. Thereafter, the loans were made.

The evidence does not show that Mrs. Joynes knew any-thing about the dealings between her sons and the appellants. It is conceded that they were not her agents, and that they had no authority to act for her. Her rights were not affected by any statement or representation made by them.

Certainly, neither the intention of the appellants to obtain a first lien nor the provision of a Federal statute that the Federal Land Bank could lend only upon a first lien can operate in law or in equity to displace the prior lien, lawfully acquired, of an innocent party. If intention is to take the place of diligence and due care, the law of negligence must be revised. The requirement of the statute emphasizes the care to be observed, but it does not fasten liability for lack of due care upon some one not responsible for the negligence.

The failure of the appellants or their representatives to communicate with Mrs. Joynes, under these circumstances, constituted gross negligence.

In *Price* v. *Lovins*, 117 W. Va. 624, 187 S. E. 318, 320, this is said: "In the case at bar, there can be no question but that the Jefferson Standard Life Insurance Company had full knowledge of the prior deed of trust made by the Bowdens to W. T. Lovins, trustee. Not only was this instrument spread upon the public record, but it was there actually discovered and reported by the attorney representing the life insurance company who, at its instance, examined the public records. Since the Jefferson Standard Life Insurance Company must be held to have gone into this transaction with its eyes open and armed with full information concerning the existing liens upon the property, it is not in position to complain that it is being treated inequitably if it did not receive a first lien upon the property. If it desired a first lien, it was its duty, know-ing of the first deed of trust already existing upon the prop-

erty, to seek out the holders of all of the outstanding notes secured by that deed of trust and to procure from them releases or waivers of their liens. *Kelly, Conservator* v. *Bank of Mount Hope* (W. Va.), 185 S. E. 215."

Under the uncontradicted facts, Mrs. Joynes, if the opportunity had been hers, might have decided to force a sale of the property in 1934 and permitted the proceeds to be applied, first, to the payment of the debt of the Shenandoah Valley Joint Stock Land Bank and the balance upon her lien. Without her knowledge or consent, the debt secured by the deed of trust of the Shenandoah Valley Joint Stock Land Bank has been paid and the lien released of record, and new liens for different amounts, with payments due at different times, have been executed and recorded with full knowledge on the part of the holders of those liens of the prior rights of Mrs. Joynes.

The following facts further emphasize what we have said:

In the three years following 1934, the loans became in arrears. Land values in Northampton county rapidly declined. It is conceded that the market value of the land is now very much less than it was in 1934, and that in all probability it will not bring a sum sufficient to discharge the obligation due the appellants.

On May 18, 1937, the appellants for the first time, made an effort to have Mrs. Joynes release and waive her vendor's lien in favor of their securities. Their letter written on that date by their attorney to Thomas E. Joynes says in part:

"We find upon investigation that this vendor's lien has never been released of record and am writing to express the hope that you will be able to get Mrs. Emma K. Joynes to execute and put on record a release of this vendor's lien. So long as it remains unreleased you can see that the general warranty in the mortgage will continue to be broken.

"And inasmuch as the Federal Farm Mortgage Corporation has accepted your payment of $892.50 on account of back installments you can readily see that your request for an extension on the unpaid balances on your installments will be more apt to receive a sympathetic response from the people that you owe if your title is perfected. So *if you and*

Mr. Garnett R. Joynes think that you can induce Mrs. Emma K. Joynes to execute a release of the vendor's lien and waive so far as our mortgages are concerned any back payments on her annuity I shall be very glad if you say so to prepare a little release with the proper recitals and send it on for execution by her." (Italics supplied.)

The record fails to disclose that, at any time between the execution of the mortgage and deed of trust and the institution of this suit, the appellants made any claim directly or indirectly to Mrs. Joynes that she had agreed to waive the lien securing her annuity, or that her sons had been constituted her agents to make such release. The letter makes no mention of a promise on the part of Mrs. Joynes. On the other hand, it shows that the appellants relied upon the general warranty of the sons notwithstanding the notice they had received of the outstanding annuity lien.

The covenants of title involve a matter of legal liability. They could not have been misleading in view of the disclosure of the state of the title.

None of the cases cited in the majority opinion contain facts similar to those of the instant case, nor do we, in an exhaustive research, find any similar case in which the principle of subrogation has been invoked.

The appellants are asking us to defeat the payment of the vendor's lien by subrogating them to a former claim against which the vendor's lien was merely waived, a claim which has been paid out of the proceeds of their loans, but none of which proceeds were used to discharge the vendor's lien. What they are really trying to do is to correct their negligence and lack of foresight.

The equities of the case favor Mrs. Joynes more than they do the appellants. She was the more innocent of the parties, and if there should be any loss, it should, therefore, be borne by the appellants.

Mrs. Joynes was more than 80 years of age when she died. Her annuity constituted practically all of her property. When she waived her lien as to the Joint Stock Land Bank debt, the value of the property of her sons was such that she might have felt that the risk involved was small. But who

knows that she would have released her lien as to the later liens? Who has the right to make a new contract for her, without consulting her, extending the payment of loans prior to her lien for twenty or twenty-five years?

Mrs. Joynes alone had the right to determine when, for whom, and under what circumstances and terms she would waive or subordinate her lien. The appellants had the right and did determine the conditions and terms upon which they would make a loan to her sons. They were not secondarily liable for the sons' debt, nor was Mrs. Joynes primarily or secondarily liable therefor.

Under the foregoing facts, we are of opinion that the rights of Mrs. Joynes are superior to those of the appellants, and that neither legal nor conventional subrogation applies to divest her of such rights. While we have gone far in Virginia in applying the principles of subrogation, it should be done with a due regard for the rights, legal or equitable, of others.

"It (subrogation) cannot be invoked so as to work injustice, or defeat a legal right, or overthrow a superior or perhaps even an equal equity, or displace an intervening right or title." *Obici* v. *Furcron*, 160 Va. 351, 168 S. E. 340, 91 A. L. R. 848. If this be true, then Emma K. Joynes had a perfect right to dispose of her property in any way she desired.

The following admirable statement is found in 25 R. C. L., under the title of Subrogation, section 9, page 1321:

"Equity violates no law, and it does not assume to make a contract for the parties; it follows the law and upholds it, and when it comes to the relief of one to whom the law cannot afford an adequate remedy it will not in so doing infringe the law or impair its force, nor will it reconstruct the contract between the parties. *Accordingly where the terms of the contract, and the conditions arising from its performance, are such as to show that the parties did not intend that subrogation should result in such case it will not result. Equity will not ingraft this doctrine on the transaction in the face of a contract that negatives the idea of subrogation. And the fact that the parties may, through ignorance of the legal con-*

*sequences of their contract, have thought that they were providing adequate new security for the money advanced, will furnish no foundation for the interposition of this equitable principle if the contract forbids it. Equity cannot reform the contract so as to make for them a contract which it may be conjectured the parties would have made for themselves if they had known what the law was. Subrogation is the creature of equity, and will not be permitted where it will work injustice to the rights of those having equal or superior equities, or where it will operate to defeat a legal right."*
(Italics supplied.)

Equity should not reconstruct the contract between the parties nor undertake to deprive the legatees of Mrs. Joynes of rights and property conferred upon them by operation of law. Equity was not intended to invade the field of law but to prevent injustice and preserve and maintain civil and property rights not in contravention of law.

This suit was instituted by Mrs. Joynes in her lifetime to subject the 87 acre tract of land to the payment of her lien thereon. Prior to the adjudication in the trial court, she died testate. In her will she devised and bequeathed her property to Thomas E. Joynes and Garnett R. Joynes for life, and at their death to other parties.

It so happens that since May 14, 1934, Thomas E. and Garnett R. Joynes have been adjudged bankrupts and have received their discharge.

The legatees and the remaindermen in the will of Mrs. Joynes took such estate as Mrs. Joynes had to dispose of. The appellees are, therefore, entitled to stand in the place and stead of their mother. If subrogation could not be applied against her, it cannot be applied against her legatees.

The bequeathed property was no more subject to the claims of the creditors of the bankrupts than other property acquired by them subsequent to their adjudication as bankrupts. Their discharge in bankruptcy is entitled to the effect of a valid law. It wipes out the suggestion of unjust enrichment at the expense of a *bona fide* creditor for value.

The bankruptcy of the sons and the subsequent bequest to them in no wise affected the rules and principles of subro-

gation. Both took place after the making of the loans in question and are wholly unconnected with that transaction.

However strongly one may believe that a debtor discharged in bankruptcy should, from property subsequently acquired, in good conscience, pay his prior debts, equity cannot supply a device for their collection which survives a discharge in bankruptcy.

The question here is not whether the appellants may pursue what they conceive to be a just claim against Thomas E. Joynes and his brother; but whether they may pursue that claim in equity regardless of their admitted negligence and the equities of an innocent party. Equity cannot be administered as a patent medicine to overcome the ills of gross negligence.

We are of opinion that the decree of the trial court should be affirmed.

HUDGINS, J., concurs in this dissent.