**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 11-1886**

_____

In re: OMAR BOTERO-PARAMO,

               Debtor,

----------------------

BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,

               Plaintiff – Appellant,

      v.

TYSONS FINANCIAL, LLC,

               Defendant - Appellee.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.   Anthony John Trenga, District Judge.  (1:11-cv-00370-AJT-IDD)

_____

Argued:  May 16, 2012               Decided:  June 8, 2012

_____

Before TRAXLER, Chief Judge, and KING and DUNCAN, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Duncan wrote the opinion in which Chief Judge Traxler and Judge King joined.

_____

**ARGUED:** Christopher Allan Glaser, JACKSON & CAMPBELL, PC, Washington, D.C., for Appellant.  Gabrielle Marcus Duvall, LINOWES & BLOCHER, LLP, Bethesda, Maryland, for Appellee.  **ON BRIEF:** David H. Cox, James N. Markels, JACKSON & CAMPBELL, PC,

1

Washington, D.C., for Appellant.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal arises from an adversary proceeding that Sutton Funding, LLC ("Sutton") initiated against Tysons Financial, LLC ("Tysons") on August 17, 2009, during the pendency of Omar Botero-Paramo's bankruptcy. Sutton sought to have the bankruptcy court either declare that its lien against some of Botero-Paramo's property had priority over Tysons's lien or to subrogate its lien into a prior position. The bankruptcy court granted summary judgment and awarded attorneys' fees in favor of Tysons. Bank of New York Mellon Trust Company, N.A. ("BONY"), which had by then purchased Sutton's interest in the property, appealed both the bankruptcy court's grant of summary judgment and its award of attorneys' fees in the United States District Court for the Eastern District of Virginia. The district court affirmed, and this appeal ensued. For the reasons discussed below, we affirm.

I.

Omar Botero-Paramo and his wife, Maritza Urdinola, owned two pieces of real property: 10447 New Ascot Drive, Great Falls, Virginia (the "New Ascot Drive Property"), and 10511 Lawyers Road, Vienna, Virginia (the "Lawyers Road Property").

When Botero-Paramo filed for bankruptcy on December 5, 2008,[1] his creditors quickly learned that the paperwork effectuating the many liens on these properties was less than a model of clarity. We will first describe the various liens against the properties, then the bankruptcy filing, and finally the procedural history of this appeal.

### A.

Botero-Paramo and Urdinola (collectively, the "Debtors") kept the Lawyers Road Property as their residence and constructed a home on the New Ascot Drive property as a "spec" home, that was to be sold. The earliest lien relevant to this appeal is a June 2005 First Deed of Trust from First Savings Mortgage for $2.79 million (the "FSM First DOT"), which the Debtors used to purchase the New Ascot Drive Property. The FSM First DOT was a short-term construction loan due on July 1, 2007. This lien encumbered only the New Ascot Drive Property.

The next lien in this appeal is a September 2005 Third Deed of Trust from Congressional Funding USA, LLC for $400,000 (the "CFUSA Third DOT"). This lien encumbered only the Lawyers

---

[1] Urdinola filed her own Chapter 11 petition on August 3, 2009. This appeal resolves pending issues in both bankruptcies.

Road Property. A sloppy refinancing of this lien created much of the controversy in this case.

In December 2005, the debtors refinanced the CFUSA Third DOT with a new loan from the same lender for $500,000 (the "CFUSA Refinancing DOT"). As a condition for this refinancing, CFUSA required a lien against the New Ascot Drive Property as additional security. The closing instructions indicate that this lien was to encumber both the Lawyers Road Property and the New Ascot Drive Property, but, for reasons that are unclear, the deed of trust only referenced the New Ascot Drive Property. The attached "Balloon Rider" also mentions only the New Ascot Drive Property on its face, although at least one of its exhibits refers to the Lawyers Road Property, as well.

To further complicate matters, the parties incorrectly filled out the form deed of trust. After some apparent crossing-out, the CFUSA Refinancing DOT, as recorded, failed to name a trustee and listed the intended trustee as the lender. Tysons purchased the CFUSA Refinancing DOT on December 27, 2005, and recorded a deed of trust correcting the above deficiencies on July 24, 2006, but the debtors neither re-executed nor re-acknowledged this corrected deed of trust as required by Virginia law.

So that they could again refinance the Lawyers Road Property in 2006, the Debtors had Tysons release its lien by

5

signing and recording a "Certificate of Release of Deed of Trust" (the "Release") in November 2006. As recorded on December 19, 2006, the "Affidavit and Release" on the Release reads: "I certify I am the holder of the above mentioned note secured by the above mentioned Deed of Trust. The Lien thereon created and retained on the above mentioned property is hereby released." The only property previously mentioned on the Release is the Lawyers Road Property.

BONY's predecessors did not take an interest in the New Ascot Drive Property until June 4, 2007, when the Debtors refinanced the FSM First DOT--the loan used to purchase that property--with a 30-year loan from American Brokers Conduit for $2.66 million (the "ABC DOT"). At the same time, another bank, Secured Lending, took what it intended to be a Second Deed of Trust (the "Secured Lending DOT") from the debtors for $625,000. The Secured Lending DOT was accidentally recorded before the ABC DOT, but later subordinated to the ABC DOT.

It is nonetheless undisputed that the CFUSA Refinancing DOT was properly recorded against the New Ascot Drive Property, even if the document recorded contained numerous errors. However, title reports prepared during this refinancing did not include the CFUSA Refinancing DOT and similarly did not reveal that Tysons now owned that lien.

6

Barclays purchased the ABC DOT for Sutton, which held the lien until roughly one month after Sutton filed this adversary proceeding. Then, in September 2009, BONY purchased Sutton's interest in the lien at a discount in light of this ongoing litigation.

B.

Botero-Paramo filed for bankruptcy on December 5, 2008. In June 2009, he filed a motion to approve the sale of the New Ascot Drive Property. This motion treated the CFUSA Refinancing DOT, which was then held by Tysons, as the first lien against the property. Tysons first objected to the sale because it proposed to repay only the principal amount, without any interest or other charges. Tysons later relented and entered into a consent order on July 17, 2009, under which it would receive the full amount of its claimed pay-off, Sutton would receive the balance, and Secured Lending would receive nothing.

Secured Lending objected to the sale on July 27, 2009, claiming that Tysons should not receive anything from the sale since it had released its lien on the New Ascot Drive Property with the Release that it recorded on December 19, 2006. Sutton echoed this claim when it too objected to the sale on August 7,

2009. Sutton began the adversary proceeding underlying this appeal ten days later.[2]

### C.

In its complaint, Sutton claimed that Tysons had released its interest in the New Ascot Drive Property, and that, in the alternative, it was entitled to equitable subrogation such that its lien would have priority over Tysons's lien.[3] The bankruptcy court granted summary judgment in favor of Tysons in a thoughtful and well-reasoned opinion. The bankruptcy court first decided the threshold question of whether deficiencies with the CFUSA Refinancing DOT rendered the intended lien unenforceable; if so, Tysons could not have priority over BONY. Applying Virginia law, the bankruptcy court determined that the deficiencies in the CFUSA Refinancing DOT did not render the

---

[2] The parties entered into a consent order on September 2, 2009, that allowed the sale of the New Ascot Drive Property free and clear of all liens for $2.78 million. The parties agreed to hold in escrow the funds needed to resolve this appeal and to disburse the remainder to BONY, as Sutton's successor, to satisfy the portion of its lien that would be paid even if it were junior to Tysons's lien. As the bankruptcy court noted, BONY received more pursuant to this agreement than it paid for Sutton's interest in the lien. J.A. 1713.

[3] Tysons counterclaimed but the bankruptcy court declined to decide those claims because deciding Sutton's, then BONY's, claims settled all of the issues in the case.

8

lien unenforceable; at the very least, it could be enforceable as an equitable mortgage.

Turning to the question of whether the Certificate of Release of Deed of Trust released Tysons's lien against the New Ascot Drive Property, the bankruptcy court determined that the Release conformed with neither the statutory form for a "Certificate of Satisfaction," which would release all of the property covered by a lien, nor the statutory form for a "Certificate of Partial Satisfaction," which would release only some of the property covered by a lien. The bankruptcy court determined that the Release was more similar to a partial satisfaction since it lacked the phrase "has been paid in full," which Virginia law requires when a satisfaction releases all of the property covered by a lien. Also supporting this conclusion was that the Release claimed only to release the lien "on the above-mentioned property," here, the Lawyers Road Property. Accordingly, the bankruptcy court found that the Release applied only to the Lawyers Road Property and that the New Ascot Property remained encumbered.

As to subrogation, the bankruptcy court found that the equities did not favor granting BONY the same priority as the FSM First DOT. In reaching this conclusion, the bankruptcy court noted that BONY was not a holder in due course, but had

purchased its interest after the deed of trust "had been squarely challenged in litigation." J.A. 1726.

Finally, the bankruptcy court awarded Tysons's attorneys' fees at a separate hearing on February 28, 2011. J.A. 2164.[4] Relevant to this appeal, the bankruptcy court found that it could "almost take judicial notice of what are prevailing fees in the Virginia area for bankruptcy-related litigation." J.A. 2159. Although Tysons had presented only testimony from its own attorney on the reasonableness of its fees, the bankruptcy court found that these fees were comfortably with the normal range of its experience and therefore found the fees to be reasonable.

BONY appealed to the district court, which affirmed the holdings of the bankruptcy court in all respects. We will consider first the claims that the bankruptcy court decided on summary judgment and then its award of attorneys' fees and costs.

---

[4] The bankruptcy court capped any fee award at the sum held in escrow in excess of the value of Tysons's lien. Therefore, although Tysons actual fees exceeded the amount in escrow, the bankruptcy court refused to award it a damages award against BONY. J.A. 2110.

10

II.

We begin our analysis of the claims decided on summary judgment by briefly considering the standard of review. We then turn to BONY's claim that Tysons lacked an enforceable lien against the New Ascot Drive Property. Finding its lien enforceable, we proceed to consider BONY's argument that Tysons released its lien against the New Ascot Drive Property when it recorded the Release on December 19, 2006, and conclude that the Release did not cover the New Ascot Drive Property. We finally examine, and ultimately reject, BONY's alternative argument that it is entitled to equitable subrogation because the proceeds of its lien paid off the FSM First DOT.

A.

When reviewing a district court's decision on appeal from a bankruptcy court, we apply the same standard of review that the district court applied when it reviewed the decision of the bankruptcy court. Terry v. Meredith (In re Stephen S. Meredith, CPA, P.C.), 527 F.3d 372, 375 (4th Cir. 2008).

We review a grant of summary judgment by the bankruptcy court and its affirmance by the district court de novo. United Rentals, Inc. v. Angell, 592 F.3d 525, 530 (4th Cir. 2010). "Summary judgment in bankruptcy is governed by Federal Rule of Bankruptcy Procedure 7056, which incorporates

11

the standards of Federal Rule of Civil Procedure 56 into bankruptcy proceedings." Id. Accordingly, "we view the facts and the reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Id.

### B.

The threshold question in this appeal is whether Tysons ever had an enforceable lien against the New Ascot Drive Property. As discussed above, the CFUSA Refinancing DOT had three deficiencies: (1) it failed to name a trustee; (2) it named the intended trustee as the beneficiary (otherwise known as the lender); and (3) it failed to mention the Lawyers Road Property. Tysons attempted to correct these deficiencies by filing a corrected deed of trust in 2006, but the debtors neither re-executed nor re-acknowledged this corrected deed of trust. The bankruptcy court noted that correcting the trustee and beneficiary did not materially alter the estate being conveyed but ultimately declined to rest its decision on this ground since a failure to name a trustee nonetheless creates an enforceable mortgage under Virginia law.[5]

---

[5] BONY's suggestion that the CFUSA Refinancing DOT did not create a lien against the Lawyers Road Property is irrelevant to this appeal, and we express no opinion on that question.

12

We find the Virginia Supreme Court's decision in <u>Bank of Christianburg v. Evans</u>, 178 S.E. 1 (Va. 1935), largely dispositive on this issue. That decision explains that "it is well settled that a deed of trust on real estate to secure creditors, in which the name of the trustee is left blank, is an equitable mortgage, and may be enforced as such upon the principle that equity will treat that as done which, by agreement, is to be done." <u>Id.</u> at 2. BONY suggests that Virginia's revised property codes, which require the listing of a trustee, changed this rule. However, it cites no case law supporting this claim. We decline to read Virginia's requirements for deeds of trust as eliminating the longstanding doctrine of equitable mortgages absent any Virginia authority indicating that such a fundamental change was intended.

BONY further contends that Tysons's lien is invalid because the CFUSA Refinancing DOT named the trustee as the beneficiary instead of Congressional Funding, and as a result, only the trustee had the authority to convey the lien to Tysons. As the bankruptcy court noted, BONY has cited no authority for the proposition that "mere misidentification of the lender's name invalidates an otherwise proper deed of trust." J.A. 1716. Indeed, "the principle that equity will treat that as done which, by agreement, is to be done," <u>Bank of Christianburg</u>, 178 S.E. at 2, appears equally applicable to misidentified lenders.

13

We agree with the bankruptcy court that as recorded, the deed of trust was sufficient to give a subsequent searcher notice that there was a lien against the New Ascot Drive Property. Indeed, as we discuss in greater detail in addressing equitable subrogation, BONY has argued neither that the lien was improperly recorded nor that one of the deficiencies on the deed of trust would prevent a title search from finding the lien. In sum, we find Tysons's lien to be enforceable.

C.

We find BONY's second argument--that the Release terminated Tyson's lien against the New Ascot Drive Property-- also lacking merit. As the district court noted, the usual process for releasing a deed of trust in Virginia is to file either a "Certificate of Satisfaction" or a "Certificate of Partial Satisfaction." Va. Code Ann. § 55-66.3(A)(1). Section 55-66.4 contemplates a partial satisfaction through which a lien covering multiple properties would be released only as to some of the properties.[6] As the bankruptcy court correctly observed, the statutory forms for a complete release and a partial release

---

[6] For the sake of clarity, we refer to a "Certificate of Satisfaction" as a "complete satisfaction" since it releases all of the property encumbered by a lien and a "Certificate of Partial Satisfaction" as a "partial satisfaction" since it releases only some of the property encumbered by a lien.

14

differ in that a complete satisfaction has the lender certify that it has been paid in full while the partial satisfaction has the lender certify that "[t]he lien of the above-mentioned deed of trust securing the above-mentioned note is released insofar as the same is applicable to _____ (description of property) recorded in deed book _____ at page _____ in the clerk's office of this court." Id. at § 55-66.4:1.

Although the Release does not comply exactly with either form--for example, it styles itself as a "release" instead of a "satisfaction"--it better comports with the form of a partial satisfaction. As noted above, the "Affidavit and Release" reads: "I certify I am the holder of the above mentioned noted secured by the above mentioned Deed of Trust. The Lien thereon created and retained on the above-mentioned property is hereby released." The only property previously mentioned on the release is the Lawyers Road Property. Notably absent is any language suggesting that the lender had been paid in full as would be customary for a complete release. In sum, we read the plain language of the Release as applying only to the lien against the Lawyers' Road Property.[7] Accordingly, we agree with the bankruptcy court that because Tysons's lien was

_____

[7] We have considered BONY's other arguments in favor of construing the Certificate of Release of Deed of Trust as a complete satisfaction and find them to be without merit.

15

recorded before BONY's, Tysons's lien has priority over BONY's unless BONY can show that it is entitled to assume a prior position through subrogation.

## D.

BONY seeks to have us give its lien the same priority as the FSM First DOT through equitable subrogation, and thereby grant it priority over Tysons's lien.  As the Virginia Supreme Court explained in Federal Land Bank of Baltimore v. Joynes, 18 S.E.2d 917 (Va. 1942), "[s]ubrogation is the substitution of another person in the place of the creditor to whose rights he succeeds in relation to the debt."  Id. at 920.  It is "not dependent upon contract, nor upon privity between the parties" but is "the creature of equity, and is founded upon principles of natural justice."  Id.  "Subrogation not being a matter of strict right, but purely equitable in its nature, dependent upon the facts and circumstances of each particular case, no general rule can be laid down which will afford a test in all cases for its application."  Id.  Virginia courts have "'long been committed to a liberal application of the principle of subrogation.'"  Centreville Car Care v. N. Am. Mortg. Co., 559 S.E. 2d 870, 872 (Va. 2002) (quoting Joynes, 18 S.E. 2d at 920).

Although the fact-intensive inquiry required in subrogation claims does not generally support bright line rules,

16

Virginia courts have traditionally adhered to two guiding principles when deciding the merits of a subrogation claim: "First, subrogation is not appropriate where intervening equities are prejudiced." Id. (internal citations removed). As the Joynes court explained, "[i]n the case of conventional subrogation where the lender of money lent it with the intention and understanding that he be substituted to the position of the creditor whose debt he paid, but without taking an assignment, where there are no intervening equities to be prejudiced, the matter will be treated as if an assignment has been executed." 18 S.E. 2d at 920. The second guiding principle is that the "ordinary negligence of the subrogee does not bar the application of subrogation where an examination of the facts . . . shows that the equities strongly favor the subrogee." Centerville, 559 S.E. 2d at 872 (internal quotation marks and alterations removed).

BONY claims that the bankruptcy court did not properly analyze its claim under these principles. BONY's argument in this regard comprises two issues: whether the purchaser of a lien assumes the equitable position of the seller, and, if so, whether subrogation is appropriate, or equitable, under these circumstances. As to the former, the bankruptcy court expressed its reluctance to conclude that BONY assumed Sutton's position vis-à-vis whether the equities favored subrogation. As to the

17

latter, the bankruptcy court also disagreed, finding that the equities did not favor subrogation.

We need not decide the complex threshold question of whether the purchaser of an interest in a lien assumes the equitable position of the seller under Virginia law. Even assuming that BONY stepped into the equitable position of Sutton and ABC, the original lender, we find that subrogation is inappropriate in these circumstances because it would prejudice Tysons.

BONY argues that it is entitled to priority over Tysons because the proceeds of its lien paid off the FSM First DOT and Tysons intended for its lien to be junior to the FSM First DOT. Thus, BONY argues that not giving its lien priority over Tysons's lien would give Tysons more than it bargained for. Although it is undoubtedly true that Tyson's predecessor, CFUSA, originally had a lien junior to the FSM First DOT, the FSM First DOT was due on July 1, 2007. In other words, the CFUSA Refinancing DOT would become the senior lien 18 months after it was recorded. We find that the Virginia Supreme Court's decision in Centreville Car Care v. North American Mortgage Co., 559 S.E.2d at 373, instructive on this point. There, the court found that effectively extending the term of a senior lien would prejudice a junior lienholder. Id. at 373. Centerville Car Care had a lien of $150,000 against a property valued at

18

$210,000. Id. Centerville was undersecured because its lien was junior to a $199,000 lien held by Fleet Bank against this same property. Id. The court explained that "[n]evertheless, Centreville had the right to anticipate that the obligors would ultimately satisfy these loans to extinguish the liens upon their interests in the property." Id.

BONY seeks to distinguish Centreville by contending that in a typical construction financing arrangement that Tysons would have expected the short-term FSM First DOT to be replaced with long term financing once a home was built on the property. However, BONY has presented no evidence to support this proposition. Although we construe facts in favor of the non-moving party on summary judgment, we need not accept conjecture. Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."). BONY has shown no issue of material fact suggesting that the bankruptcy court inappropriately granted summary judgment on the question of whether subrogation would prejudice Tysons.

Further counseling against subrogation is BONY's failure to show that the equities "strongly favor" subrogation. Centerville, 559 S.E. 2d at 872. As we have

19

noted, the fact that the title report on which BONY relied failed to indicate any liens other than the FSM First DOT does not aid its cause. In Virginia, sellers are deemed to have constructive notice of all recorded liens. Fox v. Templeton, 329 S.E. 2d 6, 8-9 (Va. 1985) ("A purchaser of real estate has constructive notice of the recorded title papers of his vendor, and is charged with notice of all that an actual examination of them would disclose."). In fact, BONY conceded at oral argument that the CFUSA recording served as notice of the lien. To the extent that the title report on which BONY relied failed to reflect it, BONY must seek relief elsewhere. On the undisputed facts presented here, where, as noted, BONY has already received more from the sale of the property than it paid for Sutton's interest, we find no basis for finding that the equities strongly favor BONY. Accordingly, we hold that the bankruptcy court properly granted summary judgment in favor of Tysons on BONY's claim for subrogation.

III.

A.

We lastly turn to BONY's contention that the bankruptcy court improperly granted Tysons's attorneys' fees. We review an award of attorneys' fees for abuse of discretion. Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235,

243 (4th Cir. 2009). Where courts are statutorily permitted to award attorneys' fees, our review "is sharply circumscribed" because we recognize that "a district court has close and intimate knowledge of the efforts expended and the value of the services rendered." Id. (quoting Plyler v. Evatt, 902 F.2d 273, 277-78 (4th Cir. 1990)). We see no reason not to afford a district court's affirmance of a bankruptcy court's award of fees this same deference. Accordingly, we reverse the bankruptcy court's award only if we determine it to be "clearly wrong." Id.

B.

The crux of BONY's argument is that Tysons failed to meet its burden to establish the prevailing market rate of attorneys' fees in the relevant community where the bankruptcy court sat, namely, Alexandria, Virginia. To calculate an award of attorney's fees, we "first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." Robinson, LLC, 560 F.3d at 243. This circuit uses a 12-part test to determine the reasonableness of the rate and the hours billed:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee

for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Id. at 243-44 (quoting Barber v. Kimbrell's Inc., 577 F.2d 216, 226 n.28 (4th Cir. 1978)). The court has previously explained that the party seeking fees has the burden of proving the reasonableness of the rate sought. Id. "In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." Id. at 244 (internal quotation marks and emphasis removed).

BONY argues that Tysons should have submitted affidavits from local attorneys other than its own counsel since the Bankruptcy Court was not itself qualified to determine whether Tysons's fees were reasonable for the Alexandria area.[8]

---

[8] BONY also argues that Tysons's own attorney, Ms. Duvall, was unable to provide adequate testimony about reasonable attorneys' fees in the community because she is not a member of the Virginia bar. BONY has offered no authority suggesting that only members of the Virginia bar are qualified to testify about reasonable attorneys' fees in Alexandria. We do not think that the district in which a testifying attorney is barred is dispositive in this inquiry.

Although this court has reversed and remanded fee awards where the only evidence that the prevailing party presented was affidavits from her own counsel, id. at 245, we have not previously considered whether a bankruptcy court may consider its own expertise when determining the reasonableness of the rate charged by attorneys as the bankruptcy court did in this case. Several of our sister circuits have recognized that when the prevailing party has failed to provide adequate evidence of reasonable fees, a district court may rely on its own expertise in determining a reasonable hourly rate, as the bankruptcy court did here. E.g., Miele v. N.Y. State Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987) (opining that a district court may rely on its knowledge of private firm hourly rates in the community in assessing the reasonableness of fees); Norman v. Housing Auth. of City of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988) ("Where documentation is inadequate, the district court is not relieved of its obligation to award a reasonable fee, but the district court traditionally has had the power to make such an award without the need of further pleadings or an evidentiary hearing."); Lucero v. City of Trinidad, 815 F.2d 1384, 1385 (10th Cir. 1987) ("The establishment of hourly rates in awarding attorneys' fees is within the discretion of the trial judge who is familiar with the case and the prevailing rates in the area"); see also CoStar

23

<u>Group, Inc. v. LoopNet, Inc.</u>, 106 F. Supp. 2d 780, 788 (D. Md. 2000) ("Evidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate. However, in the absence of sufficient documentation, the court may rely on its own knowledge of the market." (citations omitted)). Here, the bankruptcy court observed that it had several similar cases before it in which it had awarded attorneys' fees. It determined that Tysons sought fees that were within the range of fees awarded in those similar cases. Based on these comparables, it then thoroughly analyzed whether certain costs that Tysons claimed were better considered overhead and whether certain issues were overlawyered. Although this approach lacked the usual expert testimony, because nearly every case on a bankruptcy court's docket involves reviewing attorneys' fees and costs in the community, we find that bankruptcy courts are, in certain circumstances, particularly qualified to determine the reasonableness of fees based on their own expertise. Moreover, BONY has not argued that Tysons's fees were unreasonable, only that Tysons did not meet its burden of proving that its fees were reasonable. We see little value in remanding a case only so that it can generate additional attorneys' fees. On these facts, we hold that the bankruptcy court did not abuse its discretion when it awarded Tysons's attorneys' fees and costs.

24

IV.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED