**In re Robert P. REASONOVER, Wei Tu Reasonover, a/k/a Wei Tu Grandon, Debtors.**

**Robert G. Mayer, Trustee, Plaintiff,**

**v.**

**United States of America, et al., Defendants.**

**Bankruptcy No. 97–14401–SSM. Adversary No. 98–1288.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

June 3, 1999.

Robert G. Mayer, Robert G. Mayer, P.C., Fairfax, VA, Chapter 7 Trustee.

Robert K. Coulter, Assistant United States Attorney, Alexandria, VA, for the United States of America.

John T. Donelan, Alexandria, VA, for Countrywide Home Loan, Inc.

John Foster, Buonassissi Henning Campbell & Moffet, PC, Fairfax, VA, for Harbor Financial Mortgage Corp. and New American Financial Corp.

## MEMORANDUM OPINION

STEPHAN S. MITCHELL, Bankruptcy Judge.

This matter is before the court on cross-motions for summary judgment. The question to be resolved is whether the trustee's "strong-arm" powers as a hypothetical bonafide purchaser of real property trump (a) a foreclosing mortgage company's equitable claims to the property; and (b) a lien claimed by the United States of America as the holder of a criminal restitution judgment. A hearing was held on February 23, 1999, at which the chapter 7 trustee, the United States, the mortgage company,[1] and two beneficiaries of the restitution order[2] presented argument. Having reviewed the authorities cited by the parties, the court concludes that the trustee prevails over both the mortgage company and the United States except with respect to one deed of trust that had not been released of record on the date the debtor filed her petition.

*Facts*

The facts are undisputed. Wei Tu Reasonover, formerly known as Wei Tu Grandon ("the debtor"), filed a joint voluntary petition under chapter 7 of the Bankruptcy Code with her husband, Robert P. Reasonover, in this court on June 12, 1997. Unknown to her, she was still the record owner of a parcel of real estate that she thought she had conveyed some 6 months earlier. Whether a deed was prepared or signed is uncertain, but in any event no deed was ever recorded. Her intended grantee—a corporation in which she held a 50% interest—then sold the property, with

---

1. Countrywide Home Loans, Inc.

2. Harbor Financial Mortgage Corporation and New American Financial Corporation.

the purchase being financed by a mortgage company whose title search failed to pick up the break in the chain of title. Later, the purchaser defaulted, and a successor holder of the mortgage foreclosed. The debtor, herself a mortgage broker, was prosecuted in Federal court for wire fraud involving unrelated transactions. Prior to the filing of her bankruptcy petition, she pleaded guilty in Federal court and was sentenced. Part of the sentence was an order to pay restitution to the Government for the benefit of four defrauded lenders (none of them connected with the property in question). The restitution judgment, however, was not docketed in the land records until after the debtor filed her bankruptcy petition.

In broad terms, those are the facts. A number of additional details, however, are important to an understanding of the issues presented. At the time of the events in question, the debtor, then known by her former married name of Wei Tu Grandon, was a 50% shareholder in Business Depot, Inc.[3] That company had been formed in 1995 to buy rundown properties, fix them up, and sell them at a profit. The settlements on those transactions were generally conducted by Rex Title Corporation, whose principal, Susan Chang, often assisted in locating investors willing to make short term loans to Business Depot.

On May 30, 1996, Business Depot purchased a house located in Fairfax County, Virginia at 11114 Saffold Way, Reston,[4] from Charles T. and Dierdre Englehart for $105,000. At the last minute, the anticipated investor funding did not materialize, and the debtor arranged for Business Depot to deed the property to her so that she could obtain financing in her own name.

This financing took the form of a $73,500 first trust loan from Express Funding, Inc. and a $31,500 second trust loan from Paul Hshieh. After the property was fixed up, the debtor found a buyer for the property, Luis F. Delgadillo. The sales price was $151,000. The debtor instructed William Davidson, a settlement officer at Rex Title, to prepare a deed transferring the property back to Business Depot prior to the settlement so that she would not have to recognize all of the tax liability personally. For whatever reasons, a deed was either not prepared, or, if prepared, was not recorded. Instead, the only deed that was recorded (on December 31, 1996) was from Business Depot to Mr. Delgadillo. His purchase of the property was financed by a first trust loan from First Equitable Mortgage Corporation ("First Equitable") in the amount of $146,450.[5] The proceeds of the loan were used to pay off the Express Funding and Hshieh loans that the debtor had placed on the property. The First Equitable note and deed of trust were subsequently assigned to Countrywide Home Funding, Inc. ("Countrywide").

Four months later (April 11, 1997) a certificate of satisfaction was recorded in the land records releasing the Express Funding deed of trust. On May 9, 1997, a sentencing order was entered in the United States District Court for the Eastern District of Virginia, at Alexandria, after the debtor pleaded guilty to one count of wire fraud arising out of an unrelated transaction. As part of the sentence, the debtor was ordered to pay restitution in the amount of $249,000 (jointly and severally with co-defendant Thomas C. Hebert) in monthly installments of $150 for the

---

3. She has also been, since 1993, a 50% shareholder in another corporation known as Unisource Financial Corporation. Unisource was a residential mortgage broker. Its only involvement with the property at issue in this adversary proceeding was to forward the debtor's own loan application to Express Funding, Inc. That loan, as explained below, was subsequently paid off by the proceeds of the loan now held by Countrywide. Business

Depot, Inc., subsequently changed its name to First National Investment, Inc. Its charter was revoked on September 1, 1997, for failure to pay required franchise taxes.

4. The legal description of the property is Lot 21, Block 3, Section 9, Reston.

5. There was also a $4,550 second deed of trust in favor of Business Depot.

benefit of four named mortgage companies: Harbor Financial Mortgage Corporation ("Harbor Financial"), New American Financial Corporation ("New American"), Homeside Lending Corporation ("Homeside"), and Mortgage Edge Corporation ("Mortgage Edge").

On June 12, 1997, as noted above, the debtor and her husband filed a joint chapter 7 petition in this court. She did not list an interest in the Saffold Way property on her schedules because she was unaware that she had such an interest and assumed the property had been conveyed back to Business Depot at the time it was sold to Mr. Delgadillo. On June 25, 1997, approximately two weeks after the bankruptcy filing, the restitution judgment was docketed among the judgment lien records of Fairfax County. Shortly thereafter, Countrywide, unaware either of the bankruptcy or that record title was vested in the debtor, purchased the property at a foreclosure sale held on July 23, 1997. Countrywide assigned its interest to Federal National Mortgage Association ("FNMA"), and on August 12, 1997, a foreclosure deed was recorded conveying the property to FNMA for a stated consideration of $142,000. On February 25, 1998, a certificate of satisfaction was finally recorded with respect to the Hshieh loan. At some point, FNMA became aware of the break in the chain of title, and on May 20, 1998, it filed a quiet title action against the debtor and others in the Circuit Court of Fairfax County. That action was stayed once FNMA learned of the debtor's bankruptcy filing. FNMA has subsequently assigned its interest in the Saffold Way property back to Countrywide.

The present action was commenced by the chapter 7 trustee on July 10, 1998, to avoid the transfers through which Countrywide now claims title to the property, as well as the restitution lien and two unrelated judgment liens in favor of Lee Landing Condominium Unit Owners Association ("Lee Landing") and Robert and Maggie Wang ("the Wangs") docketed after the

filing of the bankruptcy petition. Named as defendants are the United States, FNMA, Mr. Delgadillo, Business Depot, Harbor Financial, New American, Homeside, Mortgage Edge, Lee Landing, and the Wangs. Answers have been filed by the United States, Countrywide (as successor in interest to FNMA), Harbor Financial, New American, and Homeside. Countrywide and the trustee thereafter filed cross-motions for summary judgment. The United States, while not formally moving for summary judgment in its favor, has filed an extensive opposition to both Countryside's and the trustee's motions asserting that the lien of its restitution judgment is superior to the interest both of the trustee and of Countryside.

## Discussion

### I.

This court has subject matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. Under 28 U.S.C. § 157(b)(2)(K), this is a core proceeding in which final orders or judgments may be entered by a bankruptcy judge. Venue is proper in this district under 28 U.S.C. § 1409(a).

Under Fed.R.Civ.P. 56(c), made applicable by Fed.R.Bankr.P. 7056, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In the present case, there are no material facts in dispute, and the contested issues are solely matters of law. Since Countrywide and the United States occupy very different positions and rely on very different statutes, their arguments will be separately addressed.

### II.

Countrywide's primary argument, reduced to its core, is that it has an equitable

claim to the property—arising under a theory of constructive trust, equitable subrogation or reformation—that is superior to the interest of the trustee. It also argues, as a subsidiary position, that the statute relied on by the trustee only permits him to set aside a transfer by the debtor, and that as a technical matter no such transfer occurred.

## A.

■ The filing of a bankruptcy petition creates an "estate" composed, among other things, of "all legal or equitable interests of the debtor in property as of the commencement of the case[.]" § 541(a)(1), Bankruptcy Code. This is subject to the qualification, however, that

> [p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate *under subsection (a)(1) or (2)* of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

§ 541(d), Bankruptcy Code (emphasis added). Put another way, a bankruptcy trustee who is claiming under § 541(a)(1) as successor to the debtor cannot acquire any greater rights in property than the debtor had, and takes the debtor's property subject to any equities in favor of third parties. The debtor's bare legal title to the property, Countrywide argues, is or should be impressed with a constructive trust in its favor, since in good faith reliance on the deed of trust granted by Mr. Delgadillo, Countrywide provided the funds to pay off the two mortgages that the debtor had

placed against the property. Accordingly, Countrywide asserts, under § 541(d) the Saffold Way property never came into the estate, and the trustee, as the holder only of the debtor's bare legal title, is not entitled to administer the property.

■ The fundamental flaw in Countrywide's argument, as the trustee correctly observes, is that property of the bankruptcy estate, while it *includes* all property interests of the debtor, is not *limited* to those interests. In particular, §§ 541(a)(3) and (a)(4), Bankruptcy Code, bring into the bankruptcy estate property that the debtor does *not* own but that the trustee is able to recover for the benefit of creditors under one or more of his special avoidance powers.[6] *See In re Cascade Oil Co., Inc.,* 65 B.R. 35, 39 (Bankr.D.Kan. 1986) (trustee enjoys additional powers in no way derivative of the debtor's rights under state law). Among such avoidance powers are the so-called "strong-arm" powers in § 544, Bankruptcy Code, and in particular, the trustee's rights as a hypothetical purchaser of real estate:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> * * *
>
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the

6. Specifically, the property interests brought into the bankruptcy estate are:
 (3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.
 (4) Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

Section 550, in turn, allows the trustee, where a transfer is avoided under §§ 544, 545, 547, 548, 549, 553(b), or 724(a) to recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of the property.

time of the commencement of the case, whether or not such a purchaser exists. § 544(a), Bankruptcy Code. Simply stated, the bankruptcy trustee is in the same position, with respect to real estate, as if he were a bona fide purchaser who bought the property from the debtor on the filing date and simultaneously perfected the transfer by recording a deed. Thus, if under Virginia law a bona fide purchaser who had bought the Saffold Way property from the debtor on June 12, 1997, and recorded a deed the same day, would have taken free and clear of Countrywide's interest arising from the sale to, and mortgage by, Mr. Delgadillo, so does the bankruptcy trustee.

█ In this connection, it is important to note that § 541(d), Bankruptcy Code, upon which Countrywide so strenuously relies, applies by its express terms only to property coming into the bankruptcy estate under §§ 541(a)(1) and (a)(2). It does not reference, and has no applicability to, property coming into the bankruptcy estate under §§ 541(a)(3) and (a)(4) through exercise of the trustee's avoidance powers. Similarly, §§ 541(a)(3) and (a)(4) make no reference to § 541(d). As Countrywide's counsel acknowledged at oral argument, bankruptcy trustees routinely use their avoidance powers to set aside—not for the benefit of the *debtor,* but for the benefit of *creditors* —unperfected security interests and unrecorded conveyances, even though such security interests and conveyances could be enforced against the *debtor* under state law. Countrywide's attempted expansion of § 541(d) beyond its textual boundaries would in many, if not most, instances render the trustee's avoiding powers nugatory. For example, an automobile finance company that shells out good cash to a dealership when a customer purchases a car but does not perfect a security interest in a timely manner clearly has a strong equitable claim and can enforce its security interest, although unperfected, against the purchaser. However, as against the bankruptcy trustee, the finance company loses

if the lien was not timely perfected. *See, e.g. Fidelity Financial Svcs., Inc. v. Fink,* 522 U.S. 211, 118 S.Ct. 651, 139 L.Ed.2d 571 (1998). Countrywide's position here is no different.

## B.

In support of its position, Countrywide cites to *Vineyard v. McKenzie (In re Quality Holstein Leasing),* 752 F.2d 1009 (5th Cir.1985); *Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.),* 874 F.2d 88 (2nd Cir.1989); and *In re General Coffee Corp.,* 828 F.2d 699 (11th Cir.1987). The court is aware of the split of authority but notes that the cases cited by Countrywide represent the minority view. *See also In re Mill Concepts Corp.,* 123 B.R. 938 (Bankr. D.Mass.1991). The majority view, which this court finds more persuasive, fully support the position that § 541(d) does not trump the trustee's avoidance powers. *See, e.g., Belisle v. Plunkett,* 877 F.2d 512 (7th Cir.1989); *Chbat v. Tleel (In re Tleel),* 876 F.2d 769 (9th Cir.1989); *Patel v. Rupp,* 195 B.R. 779 (D.Utah 1996); *In re Ebel,* 144 B.R. 510 (D.Colo.1992); *In re Great Plains Western Ranch Co.,* 38 B.R. 899 (Bankr.C.D.Cal.1984).

Except for *Mill Concepts,* the cases following the minority rule do not discuss or take into account Congress's decision to amend § 541(d) in 1984. Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, § 456, 98 Stat. 363, 376 (1984). Prior to those amendments, Section 541(d) referenced only "subsection (a)." However, the 1984 amendments significantly modified the language of the statute by striking "subsection (a)" and replacing it with "subsection (a)(1) or (2)." The legislative history is silent as to the background or reason for the amendment, but it is difficult to believe that Congress did not intend what it so clearly expressed. By excluding from the operation of § 541(d) those portions of § 541(a) other than subsections (a)(1) and (a)(2), Congress clearly signaled its inten-

tion that the trustee's avoidance powers would trump claims based solely on the debtor's lack of equitable title.[7] *See* David Gray Carlson, *The Trustee's Strong Arm Power under the Bankruptcy Code*, 43 S.C.L.Rev. 841, 930 (1992).

■ Prior to the 1984 amendments, § 541(d)'s broad reference to "subsection (a)"—which had seven subsections, including subsections (a)(3) and (a)(4) on which the trustee relies—could certainly be read (at least in isolation) as a limitation, not only on the trustee's rights as successor to the debtor, but also on his avoidance powers. *Mill Concepts* discounts the significance of 1984 amendments and argues that the modification to § 541(d) was merely a "technical change." 123 B.R. at 946. This court respectfully disagrees. When Congress speaks, the court must assume that it does so for a purpose.[8] Section 541(d) as it now reads does not, expressly or by fair implication, limit or abrogate the trustee's ability to recover property under his avoidance powers simply because the debtor has no equitable interest in that property.

### C.

Countrywide's second line of defense is that a literal interpretation of § 544(a)(3), Bankruptcy Code, does not permit the trustee to exercise his strong-arm powers unless there was a transfer *by* the debtor. Countrywide points out that although the debtor may have intended to deed the property, there is no evidence she did, and even if a deed was signed, it was never recorded.

■ The short answer to this argument is that there clearly has been a "transfer." On December 31, 1996, record title to the property was vested in the debtor, who held both legal and equitable title. The property was then conveyed by deed to Mr. Delgadillo with the debtor's knowledge and consent.[9] That she did not record a deed from herself to Business Depot to complete the chain of title is immaterial, since it is clear that she intended to convey title.

■ Second, and perhaps more importantly, the literal text of § 544(a)(3) not only does not limit the trustee's avoidance powers to transfers *"by"* the debtor, it is not even restricted to "transfers." Rather, what the statute says is that the trustee has "the *rights and powers of,* or may avoid any transfer *of* property of the debtor ... that is voidable by—... a bona fide purchaser of real property" (emphasis added). Because this preamble is phrased in the disjunctive, the trustee may exercise any "rights and powers" of a bona fide purchaser even in the absence of a "transfer." In other words, the trustee occupies the position of a bona fide purchaser and takes real property free and clear of any unperfected liens or interests. *See Realty Portfolio, Inc. v. Hamilton (In re Hamilton)*, 125 F.3d 292, 298 (5th Cir.1997); *In re Elam*, 194 B.R. 412, 416 (Bankr. E.D.Tex.1996). Because the phrase "rights and powers" in § 544(a) is separated by commas and the use of the conjunction "or" from the phrase "may avoid a transfer," a transfer by the debtor cannot

---

7. Whether Congress intended a change in the law or merely wanted to clarify what it always assumed the law to be is immaterial.

8. This is not to say that, in amending a complex statute like the Bankruptcy Code, Congress does not sometimes blunder—for example, making reference to non-existent subsections, redundantly numbering subsections, or referring to subsections that, based on context, plainly could not have been intended. However, § 541(d) in its present form betrays no evidence of drafting errors.

9. Such conveyance was clearly a "transfer," as was Mr. Delgadillo's subsequent grant of a deed of trust to Countrywide's predecessor, First Equitable. § 101(54), Bankruptcy Code (" 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.").

be a necessary condition of the exercise of the trustee's strong-arm power. *Belisle,* 877 F.2d at 515; *National Bank of Alaska v. Erickson (In re Seaway Express Corp.),* 912 F.2d 1125, 1129–30 (9th Cir.1990). In short, if a bona fide purchaser from the debtor on June 12, 1997, would have a superior "right" and title to the property as against those (such as Countrywide) claiming under the wild deed to Mr. Delgadillo, so does the trustee.

Countrywide points to several cases as supporting its restrictive reading of § 544(a)(3). *Mills v. Brown (In re Brown),* 182 B.R. 778 (Bankr.E.D.Tenn. 1995); *Mill Concepts,* 123 B.R. at 940–42; *see also* Gregg C. Gumbert, *The Trustee as a Bona Fide Purchaser of Real Property in Bankruptcy: Making Sense of Section 544(a)(3),* 15 Bankr.Dev.J. 121 (1998). The court has considered, but, for the reasons stated above, disagrees with the analysis advanced in those cases. Both *Mill Concepts* and *Brown,* in parsing § 544(a)(3), conclude that the phrase "rights and powers" in subsection (a) does not descend to subsection (a)(3) and that the phrase "such transfer" in subsection (a)(3) can only refer to a transfer *by* the debtor. *Mill Concepts,* 123 B.R. at 941; *Brown,* 182 B.R. at 781–82. Such parsing, however, does considerable linguistic and grammatical violence to the statute. The immediate and obvious reference of the first instance of "such transfer" in subsection (a)(3) is the *purchase* of the property by the bona fide purchaser. A purchase is plainly a transfer; thus there is no need to strain to equate the phrase "such transfer" in subsection (a)(3) to the "transfer of property of the debtor" referred to subsection (a). Furthermore, the *Mill Concepts* reading totally writes out of the statute the preposition "of" following "rights and powers." While statutes are not always models of good English style, the fact remains that there is no possible grammatical object for the preposition other than the "bona fide purchaser." In short, the natural reading of the statute is to confer on the trustee all the rights and powers of a bona fide purchaser.

*Mill Concepts* also looked to the circumstances surrounding the passage of § 544(a)(3) and concluded that its "apparent purpose ... militates against an interpretation which would extend its coverage to circumstances involving no transfer of the debtor's property," 123 B.R. at 942. The legislative history behind § 544(a)(3) is nonexistent, but *Mill Concepts* discussed how a trustee under the former Bankruptcy Act of 1898 at times was not able to take against holders of an unperfected mortgages in real property because he was afforded only the right of a judicial lien creditor. *Id.* In a number of states, unperfected security interests in real property take precedence over judgment lien creditors. But because in all states bona fide purchasers prevail over unrecorded mortgages, *Mill Concepts* hypothesized that Congress sought to rectify the situation by passing § 544(a)(3).

■■■■■ For purposes of this opinion, the court accepts the historical backdrop of § 544(a)(3) as outlined by *Mill Concepts.* However, the court finds it unnecessary to consider such history in light of the clear language of the section. When interpreting the Bankruptcy Code, the plain language is determinative. The court will only turn to its purpose or legislative history when the statutory language is unclear or susceptible of more than one reading. *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). As discussed, the court does not find § 544(a)(3) to be ambiguous. It is (remotely) possible that Congress may not have intended to allow the trustee to avoid inchoate equitable claims in real property, but "statutes often creates rules that reach beyond the immediate concerns that spawned them." *Belisle,* 877 F.2d at 516.

## D.

Finally, Countrywide focuses on the broad equities of its position, contending that it would be unfair to permit the trust-

ee to exercise his strong-arm powers under the circumstances of this case. According to Countrywide, the strong-arm powers were designed to prevent fraud, not perpetuate it. This rather overstates the situation. Countrywide's predecessor, First Equitable, was not, in the ordinary sense of the word, defrauded. It was simply negligent in not having an adequate title search done. Had it done so—or had Countrywide done a title search before purchasing the property in at foreclosure—Countrywide would not be where it is today. There is not the slightest suggestion in the summary judgment record that anyone set out to cheat either Mr. Delgadillo or First Equitable. Rather, all that is shown is neglect and a failure to attend to detail.[10]

■ Countrywide argues that if the trustee is permitted to administer the property, the debtor will benefit twice from the sale of the same property—first from the payment of the two deeds of trust she placed on the property, and second from the payment of her other debts by the trustee when he now sells the property. This argument might have some force if the purpose of the trustee's avoidance powers were to aid the debtor. The beneficiary of those powers, however, is not the debtor but the debtor's *creditors*, and the relative fault of the debtor is immaterial.

■ At bottom, what Countrywide is actually asking for is not fair treatment, but special treatment—and insulation from its predecessor's neglect—at the expense of other creditors. One of the fundamental goals of bankruptcy is the policy of a ratable distribution of assets to unsecured creditors. *See Tleel*, 876 F.2d at 773. As a result, the trustee is called to maximize the value of the estate and administer it accordingly. *See* § 704(1), Bankruptcy Code (the trustee is to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible

with the best interests of parties in interest"). At odds with this policy is the assertion of an inchoate equitable claim against estate property. Here, Countrywide is seeking equitable subrogation, a constructive trust, and reformation as means to preserve its interest in the real property through § 541(d), Bankruptcy Code. What Countrywide fails to grasp is that it simply holds claims, based on equity, against the estate. *See Mullins v. Paul J. Paradise & Assoc., Inc. (In re Paul J. Paradise & Assoc., Inc.)*, 217 B.R. 452, 456 (Bankr.D.Del.1997) (citing to *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1452–53 (6th Cir.1994)). Because the quiet title action was not even commenced prior to the filing of the debtor's bankruptcy petition, Countrywide's interest was never perfected against the debtor's other creditors. The trustee's strong-arm powers are meant in part to avoid "secret liens" which take away from unsecured creditors. It is understandable that Countrywide is aggrieved, but every unpaid creditor is aggrieved. The mere fact that Countrywide believed itself secured when it was not does not serve to elevate its claims over those of other creditors.

### E.

■ This is not to say that Countrywide necessarily loses. Section 544(a)(3) does not create a federal rule of decision. *Tleel*, 876 F.2d at 772; *Midlantic Nat'l Bank v. Bridge*, 18 F.3d 195, 200 (3rd Cir.1994) ("avoidance powers vis-a-vis third parties is governed entirely by the substantive law of the state in which the property is located ...") Rather, the question is whether under applicable state law a bona fide purchaser from the debtor on June 12, 1997, would have taken title to the property free and clear of Countrywide's claims.

---

**10.** In any event, if Countrywide believes it was the victim of actual fraud, it has the right to seek a determination that its claim against the debtor is nondischargeable.

■■■■ There can be little doubt that Virginia law, in the absence of intervening rights, would recognize on Countrywide's part a right of equitable subrogation to the Express Funding and Hshieh deeds of trust that were paid off by the First Equitable loan. Subrogation is an equitable remedy which substitutes another person or entity in the place of the creditor whose claim was satisfied. *Federal Land Bank of Baltimore v. Joynes*, 179 Va. 394, 401, 18 S.E.2d 917, 920 (1942). Upon substitution, the other person succeeds to the rights of the creditor in relation to the debt. *Id.* Persons entitled to subrogation may be divided into three classes.

(1) Those who acting in the performance of a legal duty, arising either by express agreement or by operation of law, in discharge of this legal duty, pay their principal's debt, such as sureties; (2) those who are not legally bound to pay the debt, but who might suffer loss if the obligation is not discharged, and who act under the necessity of self-protection; this class includes owners of property or equities, or persons interested in property who pay off prior encumbrances, and (3) strangers who act neither under compulsion nor for self-protection, but at the request of some person liable for the debt.

*Michie's Jurisprudence of Virginia and West Virginia,* Subrogation § 2 (1998).[11] Regardless of the attempts to categorize subrogation, it is "broad enough to cover all cases in which one person pays an obligation which in justice and good con-

science should have been paid by another." *Morgan v. Gollehon,* 153 Va. 246 249, 149 S.E. 485, 486 (1929); *see also Joynes,* 179 Va. at 402, 18 S.E.2d 917 ("Virginia has long been committed to a liberal application of the principle of subrogation."). As with any equitable remedy, the court must consider the facts and circumstances of each particular case. *Moritz v. Redd,* 151 Va. 644, 652, 145 S.E. 245, 248 (1928). The comparative equities of the parties must be examined to ensure that the principles of law and justice are served. *Gatewood v. Gatewood,* 75 Va. 407, 411 (1881) ("[Subrogation] is the act of the law, and the creature of a court of equity, depending not upon contract, but upon the principles of equity and justice.").

■■■■ Virginia law supports the view that "subrogation is generally allowed where the loan was made by one who took a security from the borrower which turned out to be invalid." *Morgan,* 153 Va. at 250, 149 S.E. at 486; *see also Banker's Loan & Investment Co. v. Hornish,* 94 Va. 608, 27 S.E. 459 (1897) (where the lender paid off the notes held by another bank, the new lender was subrogated to the rights of the original noteholder).

*Joynes* is illustrative of this point. In that case, Emma Joynes and her two sons owned land as tenants in common. One day Mrs. Joynes conveyed her one-third interest to her sons in return for an annuity of $700. As security, she retained a lien on her interest and her sons granted a lien on their respective interests in the land.

---

11. At least one Virginia case distinguishes between equitable *assignment* and equitable *subrogation*. *Gatewood v. Gatewood,* 75 Va. 407 (1881). According to *Gatewood,* equitable assignment applies where the person paying the debt secured by a mortgage was a surety on the debt, while equitable subrogation will be recognized where a person redeeming real estate from a mortgage " 'has such an interest in the land' as entitles him to the benefit of the security given for its payment." 75 Va. at 410–411. Other cases have classified subrogation into two categories: legal and conventional subrogation. *See Citizens Federal Bank v. Cardian Mortgage Corp.*

*(In re Cardian Mortgage Corp.),* 122 B.R. 255, 261 (Bankr.E.D.Va.1990). Legal subrogation "arises by operation of law where one having a liability, or right, or a fiduciary relation in the premises pays a debt due by another under such circumstances that he is in equity entitled to the security or obligation held by the creditor whom he has paid." *Joynes,* 179 Va. at 401, 18 S.E.2d at 920. On the other hand, conventional subrogation "arises where by express or implied agreement with the debtor, a person advancing money to discharge a prior lien might be substituted to the security of the prior lienee." *Id.*

Subsequently, the sons executed a deed of trust against the land to secure a debt owed to Virginian Joint Stock Land Bank. In conjunction with the transaction, Mrs. Joynes agreed to subordinate her liens. When payments to the bank became delinquent, the sons obtained loans from other institutions to pay off Virginian Joint Stock. These new loans were secured by a first and second lien on the property, but the parties through inadvertence did not require Mrs. Joynes to subordinate her liens. In a suit brought by Mrs. Joynes, the court held that the subsequent lenders were subrogated to the prior lien of Virginian Joint Stock. The Court acknowledged that the lenders acted negligently, but reasoned that the equities favored them because Mrs. Joynes would not be prejudiced in light of the previous subordination of her lien. *Id.* at 407–08, 18 S.E.2d at 923.

As in *Joynes*, the funds advanced by Countrywide's predecessor were used to pay off the two deeds of trust placed on the property by the debtor. Even though First Equitable was negligent in failing to discover the break in the chain of title, such negligence does not entitle the debtor to a windfall. Accordingly, were the court

faced solely with a dispute between the debtor and Countrywide, there can be little doubt that Countrywide would prevail on a theory of equitable subordination.[12]

### F.

The question therefore resolves to whether, under Virginia law, a bona fide purchaser of real property takes free of incohate equitable claims. Under the Virginia recording statutes, unrecorded conveyances and deeds of trust are "void as to all purchasers for valuable consideration without notice not parties thereto and lien creditors." Va.Code Ann. § 55–96(A)(1). Furthermore, it is well established in Virginia that a bona fide purchaser takes property free of any latent equity against it. *See, e.g., Snyder v. Grandstaff,* 96 Va. 473, 31 S.E. 647, 648 (1898) (bona fide purchaser not affected by a latent equity of reformation grounded on mutual mistake); *Ransome v. Watson's Administrator,* 145 Va. 669, 134 S.E. 707 (1926) (resulting trust not good against a bona fide purchaser); *Pair v. Rook,* 195 Va. 196, 77 S.E.2d 395 (1953) (constructive trust). To obtain the status of a bona fide purchaser, one must have neither actual

12. In its brief, Countrywide also relies on the alternative equitable remedies of constructive trust and reformation. As to the former, the court simply notes that there is a split of authority as to whether bankruptcy courts have the authority to impose a constructive trust on property of the bankruptcy estate where such a trust has not been decreed prior to the bankruptcy filing. *Compare Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron),* 206 B.R. 394 (Bankr.E.D.Va.1997) (stating in dicta that a bankruptcy court may recognize and enforce a constructive trust), *aff'd on other grounds,* 155 F.3d 718 (4th Cir.1998); *with XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.),* 16 F.3d 1443, 1452–53 (6th Cir.1994) (bankruptcy court may recognize constructive trust only where it has been decreed prior to the bankruptcy filing); *Cooper v. First Citizens Bank (In re Jones),* 186 B.R. 71, 78 (Bankr.W.D.Ky.1995); *Monfort, Inc. v. Kunkel (In re Morken),* 182 B.R. 1007, 1022–23 (Bankr.D.Minn.1995). The case for reformation is perhaps less problematic. Although the summary judgment record would not sup-

port a finding that Business Depot's sale to Mr. Delgadillo, and Mr. Delgadillo's contemporaneous grant of a deed of trust to First Equitable, involved actual fraud, it is undisputed that the debtor as record owner, Business Depot as grantor, Mr. Delgadillo as grantee, and First Equitable as the lender providing the money for his purchase of the property, all mistakenly assumed that title to the property had previously been conveyed from the debtor back to Business Depot. In the absence of intervening third party rights, there can be little doubt that a court of equity sitting in Virginia would, either under the rubric of mutual mistake or the maxim that equity will treat as done that which should have been done, quiet title in Mr. Delgadillo and those (such as Countrywide) claiming under him. Since, as will be discussed, Countrywide's alternative theories leave it in no stronger a position under Virginia law than it has under a theory of equitable subrogation, this court need not reach Countrywide's alternative grounds for equitable relief.

nor constructive notice of any defects in the chain of title. *Roanoke Brick & Lime Co. v. Simmons*, 2 Va.Dec. 70, 20 S.E. 955, 956 (1895) ("The purchaser is bound not only by actual, but also constructive, notice, which is the same in effect as actual notice.") In making a purchase, the buyer must search the chain of title, as required by the recording statutes, and exercise a degree of care when examining the records to ensure that the grantor has good title and that the property is free of encumbrances. "The great weight of authority is to the effect that the recordation of an instrument gives constructive notice of all the facts expressly stated in the instrument and other matters therein suggested which might be disclosed upon prudent inquiry." *Chavis v. Gibbs*, 198 Va. 379, 382, 94 S.E.2d 195, 197 (1956).

 The question then is what type of notice a purchaser from the debtor would have had on July 12, 1997, had he or she examined the land records. Record title would have been vested in the debtor, and a search of the grantor index would have disclosed no conveyances by her after acquiring title other than the Express Funding and Hshieh deeds of trust. On July 12, 1997, one of those (the Express Funding deed of trust) had been released of record; the other (the Hshieh deed of trust) had not. Although the Hshieh deed of trust had actually been paid off, such payment would not bar a claim of equitable subrogation, as amply illustrated by the *Gatewood* case. There, Mrs. Gatewood had sold an interest in a farm she owned to pay off a deed of trust against her husband's property under an agreement with her husband that she would be secured by a lien against his property. No lien was actually recorded, and, unknown to her, there were several judgment liens against the property at the time she paid off the deed of trust against it. The deed of trust was not released of record, but the judgment lien creditors insisted it had been discharged by payment, and that the full value of the property was available to satisfy their judgments. The then-Court of Appeals of Virginia held that Mrs. Gatewood, in paying off the deed of trust, became equitably subrogated to the rights of the deed of trust holder and was entitled to the benefit of the paid, but unreleased, deed of trust as security for her own claim. Countrywide's claim here, as successor to First Equitable, is equally strong. Accordingly, the court concludes that a bona fide purchaser would take the property subject to Countrywide's equitable subrogation claim.

### G.

In sum, as between Countrywide and the trustee, the court concludes that the trustee, as a hypothetical purchaser for value, has the better title to the Saffold Way property, but that the property is subject to a security interest in favor of Countrywide to the extent of the Hshieh deed of trust ($31,500), since that deed of trust had not yet been released on the filing date of the bankruptcy.

### III.

The other major claimant to the property is the United States as the holder of a restitution judgment against the debtor. As discussed above, that judgment was obtained prior to the bankruptcy filing but was not recorded among the Fairfax County land records until some two weeks later.

### A.

 The effect of a criminal restitution judgment by a United States District Court on property of the defendant is governed by 18 U.S.C. § 3613, which provides in relevant part as follows:

(c) **Lien.**—[A]n order of restitution . . . is a lien in favor of the United States on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986. The lien arises on the entry of judgment and continues for 20 years or until the liability is satisfied,

remitted, set aside, or is terminated under subsection (b).

**(d) Effect of filing notice of lien.**— Upon filing of a notice of lien in the manner in which a notice of tax lien would be filed under section 6323(f)(1) and (2) of the Internal Revenue Code of 1986, the lien shall be valid against any purchaser, holder of a security interest, mechanic's lienor or judgment lien creditor, except with respect to properties or transactions specified in subsection (b), (c), or (d) of section 6323 of the Internal Revenue Code of 1986 for which a notice of tax lien properly filed on the same date would not be valid.... A notice of lien that is registered, recorded, docketed, or indexed in accordance with the rules and requirements relating to judgments of the courts of the State where the notice of lien is registered, recorded, docketed, or indexed shall be considered for all purposes as the filing prescribed by this section....

**(e) Discharge of debt inapplicable.**— No discharge of debts in a proceeding pursuant to any chapter of title 11, United States Code, shall discharge liability to pay a fine pursuant to this section, and a lien filed as prescribed by this section shall not be voided in a bankruptcy proceeding.

Accordingly, although a restitution judgment immediately creates a lien enforceable against the debtor, the lien is not valid against "any purchaser, holder of a security interest, mechanic's lienor or judgment lien creditor" until the "filing of a notice of lien in the manner in which a notice of tax lien would be filed." Since no such notice had been filed on the date the debtor filed her bankruptcy petition, the trustee's status under § 544(a)(3), Bankruptcy Code, as a purchaser for value would seemingly allow him to take free and clear of the unrecorded restitution lien. To this, however, the United States interposes two arguments: first, that even though the lien was unperfected against a bona fide purchaser on the filing date, it has subsequently become perfected and is now enforceable; and second, now that it is perfected, the statutory prohibition against avoidance of the lien in bankruptcy bars the trustee's claim.

### B.

With respect to the post-petition perfection of the lien, the United States argues at great length that the recording of the restitution order was permitted as an exception to the automatic stay. While the Government's argument may in fact be correct, the court agrees with the trustee that the applicability of the automatic stay is ultimately a red herring.

The filing of a bankruptcy petition creates an automatic stay of, among other actions, "any act to create, perfect, or enforce any lien against property of the estate[.]" § 362(a)(4), Bankruptcy Code. It can scarcely be doubted that the post-petition recording of the restitution judgment in the Fairfax County land records fell squarely within the statutory prohibition *unless* it also fell within one of the exceptions in § 362(b), Bankruptcy Code. In particular, the Government relies on the exception in § 362(b)(1), Bankruptcy Code, for the "commencement or continuation of a criminal action or proceeding against the debtor" and points to *United States v. Troxler Hosiery Co., Inc.*, 41 B.R. 457 (M.D.N.C.1984), *aff'd per curiam*, 796 F.2d 723 (4th Cir.1986) as controlling authority.

In *Troxler*, the corporate debtor was fined $80,000 in a prepetition criminal contempt proceeding. After the debtor filed a chapter 11 case, the government filed an adversary proceeding seeking a declaratory judgment that its efforts to collect the fine was excepted from the automatic stay. The district court held that the collection of the fine was a permissible "continuation" of criminal proceedings. Looking to the purpose underlying the criminal justice system, the court stressed that criminal fines are designed to punish offenders and serve as a deterrence to others. *Id.* at 459. The argument that the government

is on equal standing with other creditors was rejected by the court:

> [W]hen the government is due payment of criminal fine, it is not on an equal footing with most of a bankrupt's creditors because a criminal fine *is not compensation for pecuniary loss*. A sovereign's interest in protecting its citizens through the criminal law is fundamentally different from private financial concerns and for that reason must take precedence.

*Id.* at 462 (emphasis added). *See also United States v. Coluccio,* 19 F.3d 1115, 1117 n. 2 (6th Cir.1994) ("the protective stay ... is not absolute, and allows enforcement of criminal laws and penalties incident thereto."); *United States v. Palm Beach Cruises,* 204 B.R. 634 (S.D.Fla. 1996); *In re Sims,* 101 B.R. 52, 54–55 (Bankr.W.D.Wis.1989); *Gilliam v. Metropolitan Gov't of Nashville,* 67 B.R. 83, 87 (Bankr.M.D.Tenn.1986).

■ A restitution judgment, however, differs fundamentally from a fine. Unlike a fine, restitution is by its very definition "compensation for pecuniary loss." In its analysis, *Troxler* goes to great pains to emphasize the non-compensatory aspect of fines. *Id.* at 461 ("A criminal sentence, whether it is imprisonment or fine, is not direct compensation for a pecuniary loss but is punishment for violation of criminal law."), *Id.* at 462 ("fines, penalties, forfeitures, and exemplary damages are not compensation for actual pecuniary losses").

It is true that *Troxler* does cite to cases holding that restitution orders are also excepted from the automatic stay, *Id.* at 461, but it never addresses how such orders might fit it with its own analysis and never focuses on the compensatory nature of such an order.

■ As the trustee correctly points out, nothing in the language or structure of 18 U.S.C. § 3664—the statute which provides for such orders—suggests that the focus of restitution in the Federal criminal system is punishment; rather the clear intent is to make the victim whole. Thus, for example, the statute does not require the sentencing court, in determining the amount of restitution, to consider such factors as the seriousness of the offense, the offender's criminal past, or his or her potential threat to society. The court can only conclude that a restitution order in the federal system is simply a mechanism for victims to collect their losses. It is of course true that restitution obligations imposed as part of a criminal sentence are not dischargeable in bankruptcy,[13] but that is a wholly different issue from whether the automatic stay temporarily applies to their enforcement while the various rights of the parties are being sorted out. Accordingly, notwithstanding the Government's strenuous reliance on *Troxler*, the holding of that case simply does not support its argument that enforcement of restitution orders, as distin-

---

13. § 523(a)(13) (federal restitution orders); *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (state restitution orders); In *Kelly,* the Supreme Court held that a restitution order imposed by a state judge as a condition of the debtor's probation was nondischargeable under § 523(a)(7), Bankruptcy Code, which excepts from discharge any debt that "is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for *actual pecuniary loss.*" (emphasis added). The underlying focus of *Kelly,* however, had little to do with whether a restitution order was compensatory or punitive; rather, the primary concern of *Kelly* was federal interference with state criminal prosecutions. The

Court did not want to "hamper the flexibility of state criminal judges in choosing the combination of imprisonment, fines, and restitutions most likely to further rehabilitative and deterrent goals of state criminal justice systems." *Id.* at 49, 107 S.Ct. at 360. Evidently Congress itself did not read the analysis in *Kelly* as necessarily applying to federal restitution orders, since it amended § 523(a), Bankruptcy Code, in 1994 to add paragraph (13), which excepts from discharge a debt for any payment of restitution order issued under title 18 of the United States Code. *See* The Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (1994).

guished from fines, is excepted from the automatic stay.

█ Ultimately, however, it is not necessary to decide that thorny issue, since the post-petition recording of the restitution judgment cannot affect the trustee's rights regardless of whether the recording violated the automatic stay. Under § 544(a)(3), Bankruptcy Code, the trustee's "rights" to the Saffold Way property are determined "as of the commencement of the case," and cannot be affected by subsequent events, unless under applicable nonbankruptcy law such events would "relate back" to a time before the filing of a petition.[14] There is absolutely nothing in the language of 18 U.S.C. § 3613(c) suggesting that the lien of a restitution judgment would ever relate back to defeat the interest of an intervening purchaser or judgment creditor. Indeed, the very language of the statute implies the contrary: "*Upon filing* of a notice of lien in the manner in which a notice of tax lien would be filed under section 6323(f)(1) and (2) of the Internal Revenue Code of 1986, the lien shall be valid against any purchaser, holder of a security interest, mechanic's lienor or judgment lien creditor" (emphasis added). The Government, to be sure, does not argue that the interest of an *actual* bona fide purchaser would be affected by the subsequent recording of a restitution judgment. Rather, the Government seems to suggest that if the automatic stay does not apply, then, ipso facto, the trustee's interest can be defeated by a post-petition perfection of the judgment lien. The syllogism fails, however, because there is simply no logical relation between the existence (or nonexistence) of a stay and the ability of a lien to relate back. The simple fact is that on June 12, 1997, a bona fide

purchaser would have taken free of the unperfected restitution lien and would not have been affected by a subsequent recording of the lien. Under § 544(a)(3), the bankruptcy trustee occupies an identical position and is similarly unaffected.

### C.

█ The United States contends, however, that even if its lien could not be enforced against a real purchaser, it is nevertheless enforceable against the trustee as hypothetical purchaser because of the proscription against avoidance in 18 U.S.C. § 3613(e):

> No discharge of debts in a proceeding pursuant to any chapter of title 11, United States Code, shall discharge liability to pay a fine pursuant to this section, *and a lien filed as prescribed by this section shall not be voided in a bankruptcy proceeding.*

(emphasis added). The government notes that entry of an order of restitution immediately creates a lien in favor of the United States on all property and rights to property of the defendant. 18 U.S.C. § 3613(c). Therefore, it is argued, because the lien arose prepetition, the fact that it had not been perfected by recordation is irrelevant, since the trustee can shuck an unperfected lien only by avoiding it—the very thing that § 3613(e) forbids.

Looking to the text of the statute, it is far from clear exactly what Congress intended when it adopted 18 U.S.C. § 3613(e).[15] Unfortunately, the legislative history of § 3613(e) is nonexistent, thus providing no extra-textual insight as to exactly what evil Congress sought to address beyond the general goal of "[improving] the administration of justice in Federal criminal cases by requiring Federal

---

14. Under Virginia law, for example, the filing of a mechanic's lien can relate back nearly four months.

15. 11 U.S.C. § 3613(e) was originally designated § 3613(f) when first enacted by the Comprehensive Crime Control Act of 1984, Pub.L. 98–473, 98 Stat. 2006 (1984). In

1994, Congress moved the text of subsection (f) to subsection (e) and added the language, "a lien filed as prescribed by this section shall not be voided in a bankruptcy proceeding." *Antiterrorism and Effective Death Penalty Act of 1996*, Pub.L. No. 104–132, 110 Stat. 1238 (1996).

criminal defendants to pay full restitution to the identifiable victims of their crimes." S.Rep. No. 104–179, at 12 (1995). The interpretive task is not made easier by the lack of any reported cases construing the 1994 amendments.

At bottom, then, one is left with the text of the statute. The fundamental flaw in the Government's reading is that it gives weight only to that part of the text stating that the lien "shall not be voided" and ignores the qualifying phrase "filed as prescribed by this section." Under 18 U.S.C. § 3613(e), it is only "a lien *filed as prescribed by this section*" that cannot be voided in bankruptcy, and the statute simply does not address the unperfected lien that arises upon entry of the judgment order but before recordation. On the date the debtor filed her bankruptcy petition, notice of the restitution judgment had not yet been filed in the land records. Had it been, the conclusion is inescapable that the trustee could not have set it aside. In the present case, however, title had already passed from the debtor to the trustee prior to the recording of the restitution judgment. No lien attached to that interest, because § 3613(c) states that the unperfected lien is not "valid" against a purchaser. The subsequent recording of the judgment was ineffective to create any lien against the trustee's interest, just as it would not have created a lien against the interest of an actual bona fide purchaser. Thus, in literal terms, there is nothing for the trustee to "void," in the sense of setting aside something that is otherwise valid. Rather, the trustee is simply seeking a declaration that no lien ever attached to his interest. Consequently, the court concludes that § 3413(e) does not bar the trustee's claim that he holds title to the Saffold Way property free and clear of the lien arising from the restitution judgment.[16]

### IV.

For the reasons stated, the trustee's and Countrywide's motions for summary judgment will each be granted in part and denied in part. A separate judgment will be entered determining that the trustee holds good title to the Saffold Way property free and clear of the restitution judgment, and free and clear of Countrywide's deed of trust except to the extent of $31,500 in principal, as to which it is equitably subrogated to the Hshieh deed of trust.[17]

---

**16.** An alternate analysis would reach the same result. In addition to the rights of a bona fide purchaser of real estate, the bankruptcy trustee also has the rights of a hypothetical creditor "that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists." § 544(a)(1), Bankruptcy Code. In Virginia, the docketing of a judgment is effective to create a lien against the judgment debtor's real estate. Va.Code Ann. § 8.01–458. Thus, under § 544(a)(1), the trustee is treated as a judgment lien creditor who obtained his judgment lien against the debtor's real estate on the date of the bankruptcy filing. A restitution lien has the same priority as a Federal tax lien. 18 U.S.C. § 3613(c). An unrecorded Federal tax lien is subordinate to a judgment lien properly perfected under state law. *United States v. Estate of Romani*, 523 U.S. 517, 118 S.Ct. 1478, 140 L.Ed.2d 710 (1998). Accordingly, the restitution lien, which was not docketed until two weeks later, is subordinate to the trustee's interest as a hypothetical judgment lien creditor. Thus, it is not in any sense necessary to "void"—in the sense of setting aside—the lien of the restitution judgment. It remains on the property, but simply subject to the paramount lien in favor of the trustee as hypothetical judgment lien creditor.

**17.** At the time the motion for summary judgment was argued, effective service had not yet been made on Lee Landing or the Wangs. Accordingly, the court declines to make any ruling with respect to their judgments. In this connection, the court notes that Lee Landing and the Wangs have apparently since

been served, and that a separate motion is pending for default judgment as to them.