In re SHC, INC., et al., Debtors.

Sierra Investments, LLC, Plaintiff,

v.

SHC, Inc. and Top–Flight, Inc., Defendants.

Bankruptcy No. 03–12002 (MFW).
Adversary No. 04–52607–MFW.

United States Bankruptcy Court, D. Delaware.

Aug. 25, 2005.

Joseph A. Malfitano, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, for debtors.

## MEMORANDUM OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are the Motions of Sierra Investments, LLC ("Sierra") to dismiss the Counterclaims of SHC, Inc. and Top–Flight, Inc. (collectively the "Debtors"), the Committee of Unsecured Creditors (the "Committee"), and Bank of America, N.A. as agent for the pre-petition secured lenders (the "Lenders"). For the reasons set forth below, the Court will grant in part and deny in part the Motions to Dismiss.

## I. *FACTUAL BACKGROUND*

On August 15, 1996, the predecessors in interest to Sierra and the Debtors executed a Recapitalization and Stock Purchase Agreement (the "SPA"). Under the SPA,

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

Sierra was obligated to pay, inter alia, taxes that arose before the closing date (September 30, 1996). To fund its indemnification obligations to the Debtors under the SPA, Sierra deposited funds into an escrow account pursuant to an Escrow Agreement between the parties. The Escrow Agreement specified that any funds remaining in the escrow account, after the expiration of the applicable deadlines for assessment of taxes, were to be returned to Sierra.

On April 14, 1997, the Commissioner of Revenue of the Commonwealth of Massachusetts ("Massachusetts") issued a Notice of Intent to Assess the Debtors' predecessor. On October 5, 1998, the Debtors were notified that Massachusetts had assessed taxes totaling $3,320,249 for tax years 1993 to 1995. In order to contest the assessment, Massachusetts law required that the tax be paid first. On October 19, 1998, Sierra directed the escrow agent to transfer funds from the Escrow Account to the Debtors to satisfy the tax assessment. On October 29, 1998, the Debtors paid the tax assessment and filed an appeal.

In the interim, on March 30, 1998, the Debtors executed a Security Agreement with the Lenders whereby the Debtors pledged substantially all of their assets (including proceeds) as collateral for loans. On April 19, 2002, Sierra and the Debtors executed an Assignment Agreement (the "Assignment"), pursuant to which the right to any tax refund which might be due from Massachusetts for 1993 to 1995 was transferred to Sierra in exchange for its prior payment of the tax assessment. In accordance with that agreement, the Debtors directed Massachusetts to pay Sierra any refunds to which the Debtors may be entitled.

On June 30, 2003, the Debtors filed petitions for relief under chapter 11. On August 5, 2003, the Court entered an Order (A) Authorizing the Use of Cash Collateral and (B) Granting Replacement Liens and Superpriority Claims to the Pre-petition Lenders (the "Cash Collateral Order"). That Order granted the Lenders adequate protection liens on all property of the Debtors, including after-acquired property and proceeds.

On September 19, 2003, the Debtors and Massachusetts reached a settlement agreement which acknowledged that Massachusetts owed the Debtors a tax refund of $1,937,603 (the "Refund") for tax years 1993 to 1995. The settlement was approved by the Court on March 24, 2004.

On February 17, 2004, Sierra filed a Complaint seeking a turnover of the Refund issued by Massachusetts. Sierra asserts that the Refund is not property of the estate and that a constructive trust in its favor should be imposed on the Refund.

The Debtors filed an Answer and Counterclaims on March 18, 2004. The Committee and the Lenders were permitted to intervene in the proceeding. On June 2, 2004, the Committee filed a response and counterclaim virtually identical to that of the Debtors. The Liquidation Trustee (the "Trustee") was substituted for the Committee on October 13, 2004. The Lenders filed a separate Answer and Counterclaims on April 20, 2004. The Lenders incorporated the Debtors' Counterclaims and added three additional ones.

Sierra filed Motions to Dismiss all the Counterclaims. The Motions have been briefed and are ripe for decision.

## II. JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

## III. DISCUSSION

### A. Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must determine whether the plaintiff could be entitled to relief based on any reasonable reading of the pleadings. In doing so, the Court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them. *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir.2000) (citations omitted).

■ In this case, the parties' dispute hinges on the interpretation of the various agreements between them. The Court may consider documents which are incorporated into the complaint or counterclaim, even if they contradict the allegations. *See, e.g., ESI, Inc. v. Coastal Power Prod. Co.*, 13 F.Supp.2d 495, 497 (S.D.N.Y.1998) ("If the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint.") (citations omitted); *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 649 (W.D.Pa. 1999) ("In the event of a factual discrepancy between the pleading and the attached exhibit, the exhibit controls.") (citations omitted).

A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. Debtors' Counterclaims

The Debtors (joined by the Trustee and the Lenders) filed several Counterclaims to Sierra's Complaint. Sierra seeks to dismiss them all.

#### 1. Indemnification Provisions of the SPA

■ The Debtors seek a declaratory judgment that they have no obligation under the SPA to repay Sierra for the tax payment it made. The Debtors argue that the only indemnity obligations under the SPA are contained in Article VIII (which deals exclusively with taxes) and Article XI (which expressly excludes taxes from its coverage). The Debtors acknowledge that Article XI does provide for repayment to Sierra of claims it may have paid under its indemnification obligations. For example, the Debtors are obligated to repay Sierra if they recover any insurance for a claim on which Sierra has already indemnified them. (SPA at § 11.01(d).) However, Article XI expressly states that it is not applicable to any indemnification for taxes. (*Id.*)

Furthermore, the Debtors assert that Article VIII, the provision of the SPA which relates to taxes, does not have any similar provision which would require the Debtors to repay Sierra if it receives insurance or any other repayment of a claim already paid by Sierra under its indemnification obligations. This absence, the Debtors assert, requires the conclusion that they have no obligation to repay Sierra. They argue this is mandated by the maxim of contract interpretation *expressio unis est exclusio alterius* (to express or include one thing implies the exclusion of the alternative). *See, e.g., VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir.2001). The Debtors assert this is particularly telling since Article VIII does require that the Debtors pay Sierra any tax refund they receive for the tax year ending September 30, 1996. (SPA at § 8.01(a).) Again, the Debtors argue that the absence of any reference to Sierra's entitlement to tax refunds for any other

years mandates the conclusion that Sierra is not entitled to them.

Sierra disagrees with the Debtors' conclusion that the SPA prohibits any reimbursement of Sierra for the tax overpayment it made. Sierra argues that it was only obligated under the SPA to indemnify the Debtors for taxes due to Massachusetts. It paid taxes assessed by Massachusetts in order to permit the parties to appeal the assessment. Sierra argues that, because Massachusetts reduced the amount of this assessment later, Sierra's payment included taxes that were never due. Because Sierra was never obligated to indemnify the Debtors for taxes that they did not owe, Sierra asserts that this overpayment (the Refund) should be returned to it.

Sierra argues that the Debtors' interpretation of the SPA ignores the plain meaning of the word "indemnify"[2] and expands it to require Sierra to pay items it did not agree to pay. Sierra argues that the mere fact that the Debtors did not have an express obligation under the SPA to reimburse Sierra for the overpayment cannot mean that Sierra has no remedy. Sierra argues it would be illogical to conclude that it was not entitled to the refund, when under the SPA it was permitted to appeal tax assessments and required to pay the expenses of those appeals. Sierra argues that the Debtors' interpretation defeats the intentions of the parties to the contract and would bestow a windfall on the Debtors. Thus, it argues, the interpretation may not be entertained by the Court. *Hartford Fire Ins. Co. v. Novocar-*

*go USA, Inc.,* 257 F.Supp.2d 665, 675 (S.D.N.Y.2003); *Price v. Price,* 69 N.Y.2d 8, 511 N.Y.S.2d 219, 503 N.E.2d 684, 689 n. 3 (1986).

The Court agrees with Sierra that the Debtors' interpretation of the SPA leads to an absurd result. There is no express provision of the SPA which states categorically that Sierra is not entitled to recover the overpayment. Although Article VIII does not specifically provide that the Debtors must repay Sierra for any overpayment of taxes it makes, the Court concludes that the lack of such a provision is irrelevant. The SPA provided that Sierra was only to be liable for actual taxes due for tax years prior to 1996 and that the Debtors would be liable for tax years after 1996.[3] (SPA at § 8.01(a) & (b).) It provided that the party who was liable for the tax also had the right to control any audit or appeal of those taxes and the corresponding obligation to pay for the expenses of that audit or appeal. (*Id.* at § 8.03.) To conclude that the party who paid the expenses and had the right to control the appeal did not have the right to the fruits of that appeal is illogical.

The SPA also does not provide that if the Debtors paid more than they agreed for the stock they were purchasing (because of a mathematical or bank error for example), they would be entitled to recover the overpayment. Yet the Debtors surely would not concede that they would not be entitled to recover such an overpayment. An express "indemnification" provision is not necessary for a party to recover pay-

---

**2.** Sierra argues that "indemnify" is not an ambiguous term, it means to compensate or reimburse. *Black's Law Dictionary* 772 (7th ed.1999).

**3.** The parties agreed to allocate the taxes for 1996 with Sierra being liable for taxes before September 30 and the Debtors being liable for taxes after that date. (SPA at § 8.02.) Be-

cause the SPA was executed prior to that date, the SPA specifically provided that Sierra would get any tax refund for taxes through September 30, 1996. (*Id.* at § 8.01(a).) This does not mean, however, that it would not be entitled to tax refunds for any prior year for which it was liable.

ments made that exceed its obligation under a contract.

The *Telemundo Group, Inc. v. Alden Press, Inc.*, 181 A.D.2d 453, 580 N.Y.S.2d 999 (N.Y.App.Div.1992) case is on point. In that case, Telemundo and Alden Holdings, Inc. had executed a stock purchase agreement which provided for a reduction of the purchase price for an anticipated tax refund. However, the contract did not expressly state that the tax refund was to be paid to the seller. The tax refund was received after closing and kept by the buyer. The seller sued for breach of contract, conversion and unjust enrichment. The lower court granted summary judgment in favor of the buyer, finding no provision of the contract required the payment of the tax refund to the seller. The appellate court reversed, concluding that the lack of a specific provision in the contract did not preclude the seller from asserting its entitlement to the tax overpayment. *See also, Payne v. Witherbee, Sherman & Co.*, 132 A.D. 579, 117 N.Y.S. 15 (1909) (holding that overpayments made by mistake cannot be retained in the absence of proof of prejudice).

The logical interpretation of the SPA mandates that, if any party paid more than it was obligated to pay under that agreement, that party would be able to recover the overpayment. The Debtors acknowledge that the tax assessment paid by Sierra was more than what was owed to Massachusetts and, therefore, more than Sierra's obligation under the SPA. Therefore, the Court concludes that Count I of the Debtors' Counterclaims must be dismissed.

### 2. *Lack of Consideration for Assignment*

■ The Debtors also assert that the Assignment is void for lack of consideration. Therefore, they argue that Sierra cannot assert any claims based on it. The Assignment was executed more than three years after Sierra had paid the tax assessment. Further, the Debtors argue that the payment by Sierra simply fulfilled its indemnification obligation to the Debtors under the SPA. Consequently, the Debtors argue that Sierra cannot rely on consideration given for the SPA to support the Assignment.

Sierra disagrees. It argues that the Assignment was a written assignment, governed by New York law which states: "An assignment shall not be denied the effect of irrevocably transferring the assignors' rights because of the absence of consideration, if such assignment is in writing and signed by the assignor, or by his agent." N.Y. Gen. Oblig. Law § 5–1107. *See also Whalen v. Gerzof*, 206 A.D.2d 688, 615 N.Y.S.2d 465, 467 (N.Y.App.Div.1994) (denying an argument based on lack of consideration because section 5–1107 applied).

The Debtors admit that, if section 5–1107 applies, the grant to Sierra of the rights to the Refund without consideration would be enforceable. However, they argue that section 5–1105 applies rather than section 5–1107. This is so because the Assignment was not without consideration but was purportedly based on past consideration. Section 5–1105 provides:

> A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y. Gen. Oblig. Law § 5–1105.

Sierra asserts that it is also entitled to recover the Refund under section 5–1105.

It asserts that past consideration can be found in its authorization of the payment of the taxes to Massachusetts from the escrow account.

The Debtors argue that under section 5–1105 Sierra must establish that past consideration was given which would be adequate but for the time when it was given. The Debtors argue that the alleged past consideration, the release of the escrow funds, is not sufficient because Sierra had an existing obligation under the SPA to release those funds. Therefore, the Debtors argue that the Assignment was not supported by adequate consideration because the alleged consideration was for the SPA, not the Assignment.

The Court concludes that the Debtors' arguments are without merit. Under New York law, section 5–1107 applies to the Assignment because it is more specific than section 5–1105. *Eagle Comtronics, Inc. v. Northeast Filter Co.*, 1991 U.S. Dist. LEXIS 16965 *13, n. 5, 1991 WL 247551 *8, n. 5 (N.D.N.Y. Nov. 22, 1991). The Assignment was in writing and is, therefore, valid regardless of whether any consideration was given. N.Y. Gen. Oblig. Law § 5–1107. Consequently, the Court will grant the motion to dismiss as to Count II of the Debtors' Counterclaim.

### 3. *Fraudulent Transfer under New York Law*

■ The Debtors also assert that the transfer of the right to the Refund under the Assignment is avoidable under New York law as a fraudulent conveyance. 11 U.S.C. § 544; N.Y. Debt. & Cred. Law § 278. They allege that at the time of the Assignment, (1) the Debtors were already indebted to other creditors, (2) the Assignment was executed by the Debtors with the specific intent to hinder and delay other creditors' rights, (3) the Assignment was not disclosed to any other parties, and

(4) the Debtors had unreasonably small capital remaining and incurred or intended to incur debts beyond what they could pay.

In addition, the Debtors argue that Sierra's prior release of the escrow funds does not constitute reasonably equivalent value for the Assignment, because it is not even valid consideration. *See, e.g., Palmer v. Safe Auto Sales, Inc.*, 114 Misc.2d 964, 452 N.Y.S.2d 995, 996 (N.Y.Civ.Ct.1982) (holding that pre-existing duties cannot be consideration); *Cronk v. State*, 100 Misc.2d 680, 420 N.Y.S.2d 113, 117 (N.Y.Ct.Cl. 1979) (finding that consideration was not present where promises exchanged were for performance of pre-existing legal duties).

Sierra responds that the Assignment merely confirmed its rights under the SPA. Thus, the Assignment was due to Sierra under an existing obligation of the Debtors (an antecedent debt). Therefore, Sierra argues, the Assignment does not constitute an avoidable fraudulent transfer. N.Y. Debt. & Cred. Law §§ 272 & 273 (defining fair consideration to include satisfaction of an antecedent debt). *See also Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981) (holding that discharging or securing an antecedent debt of substantially equivalent value does not give creditors a basis for a fraudulent conveyance action).

The Debtors counter that Sierra's release of escrow funds was required by section 8.01 of the SPA and thus was not a voluntary act. Because it was not voluntary, the Debtors argue, it cannot constitute consideration for the Debtors' assignment of the Refund.

Sierra responds that the amount it paid was *more* than it was required to pay under the SPA. The original assessment by Massachusetts was $3,320,249, which was paid by Sierra. The parties ultimately

agreed that only $1,382,646 was in fact due (meaning that Sierra had overpaid $1,937,603). Sierra argues that the excess payment is fair consideration for the Assignment.

The Court agrees with Sierra. The Assignment gave Sierra the right to any tax refund due as a result of Sierra's payment of taxes. If a tax refund was due to the Debtors from Massachusetts, it was only because (and in the amount) of the overpayment made by Sierra. The SPA required that Sierra pay taxes actually due by the Debtors, not pay more. Therefore, Sierra provided reasonably equivalent value for the Assignment by overpaying the taxes due by the Debtors. This Count of the Debtors' Counterclaims will also be dismissed.

### 4. Objection to Sierra's Claim

■ The Debtors assert two objections to Sierra's secured claim. First, the Debtors argue that the Assignment is unenforceable because it was a fraudulent conveyance, and Sierra, therefore, has no claim. As discussed in Part 3 above, however, the Debtors cannot establish that the Assignment was a fraudulent conveyance. Therefore, they have stated no valid basis to object to Sierra's claim.

The Debtors also argue that Sierra's claim is unsecured because the transaction between the parties constituted an unsecured loan and the SPA did not grant Sierra a security or other interest in the Refund. Thus, they request that Sierra's claim be reclassified as unsecured.

Sierra disagrees. It argues that nothing in the documents indicates an intention to treat the tax payment made by Sierra as an unsecured loan. Instead, Sierra argues that the payment remained its property until the tax owed to Massachusetts was finally determined. It did not intend that payment to be a loan to the Debtors.

Rather, the payment was made in order to allow Sierra to protest the amount of the tax.

The Court agrees with Sierra. Neither the language of the SPA or the Assignment supports a finding that the payment of the taxes was intended as a loan. In fact, the Assignment expressly states that the payment was not property of the Debtors and any refund was to be held by the Debtors for Sierra:

> The Claim Amount, or any portion thereof, will not constitute property of the [Debtors], and therefore must either be returned to the Escrow Agent for disbursement in accordance with the terms of the Cash Escrow Agreement or paid over to [Sierra]. . . . If, despite the intent of the parties, any right to a refund, in whole or in part, resulting from the payment and challenge to the Tax Assessment has not been effectively assigned and transferred to [Sierra], but remains with the [Debtors], then the [Debtors] intend to receive and hold in trust for the benefit of [Sierra] the whole or any portion of a refund received by the [Debtors] and to disburse the same as provided herein.

(Assignment at p. 2.)

Although the Debtors might have had legal title to the Refund, equitable title rested in Sierra. 11 U.S.C. § 541(d). Thus, Counts IV and VI of the Debtors' Counterclaims which seek the disallowance or reclassification of Sierra's claim as unsecured will be dismissed.

### 5. Equitable Subordination

■ The Debtors also seek equitable subordination of Sierra's claim. A court may subordinate a claim where: (1) the claimant engaged in some inequitable conduct; (2) the claimant realized an unfair advantage by doing so, and other creditors

were injured as a result of the misconduct; and (3) the subordination of the claim is in harmony with other provisions of the Bankruptcy Code. *See, e.g., Citicorp Venture Capital Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 323 F.3d 228, 233–34 (3d Cir.2003); *Bank of N.Y. v. Epic Resorts—Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.),* 307 B.R. 767, 772 (D.Del.2004).

■ Where equitable subordination is requested against a non-insider creditor, the plaintiff's burden is heavier. *Epic Capital,* 307 B.R. at 772. It must allege "a more egregious level of misconduct" to satisfy the first prong of the test. *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.),* 151 B.R. 327, 333 (Bankr. D.Del.1993). It must do so with particularity. *Bank of N.Y. v. Epic Resorts–Palm Springs Marquis Villas (In re Epic Capital Corp.),* 290 B.R. 514, 524 (Bankr. D.Del.2003). Fraud, spoliation, overreaching, breach of fiduciary duties, undercapitalization, and the claimant's use of the debtors as a mere instrumentality are examples of egregious misconduct. *See, e.g., Waslow v. MNC Commercial Corp. (In re Paolella),* 161 B.R. 107, 118 (E.D.Pa.1993) (citations omitted); *Aluminum Mills Corp. v. Citicorp N. Am., Inc. (In re Aluminum Mills Corp.),* 132 B.R. 869, 896 (Bankr.N.D.Ill.1991); *Epic Capital,* 290 B.R. at 524.

Sierra argues that because it is neither an insider nor a fiduciary, the Debtors must show that it engaged in egregious inequitable conduct. Sierra alleges that the Debtors have not sufficiently alleged egregious conduct and thus have not stated a claim for equitable subordination.

The Debtors disagree. They argue that Sierra collaborated with the Debtors on the eve of their insolvency to enter the Assignment without any consideration given to the Debtors. The Debtors assert that by these actions, Sierra engaged in fraud. Their Counterclaims provide details of the circumstances of negotiating the Assignment, including allegations of fraudulent behavior.

The Court concludes that the Debtors have pled sufficient facts to put Sierra on notice of the alleged fraudulent conduct underlying the claim for equitable subordination. This suffices to pled a claim for equitable subordination against a non-insider. *Epic Capital,* 290 B.R. at 524. Therefore, Count V of the Debtors' Counterclaims will not be dismissed.

### C. Lenders' Counterclaims

■ To the extent the Lenders' Counterclaims duplicate the Debtors', the Court makes the same rulings as above. The Lenders have asserted additional Counterclaims which are premised on their assertion that they have a perfected security interest in the Refund which has priority over Sierra's interest. The Lenders security interest was granted in March 1998, before the Assignment from the Debtors to Sierra in April 2002. Additionally, the Lenders assert that their security interest was confirmed (and given priority) by the Cash Collateral Order.

#### 1. Entitlement to Constructive Trust

■ The Lenders assert in Count VII of their Counterclaims that Sierra is not entitled to a constructive trust because it cannot meet the four elements imposed by New York law: (1) a confidential or fiduciary relationship; (2) a promise made; (3) a transfer in reliance thereon; and (4) unjust enrichment. *Sharp v. Kosmalski,* 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 351 N.E.2d 721 (N.Y.1976). The Lenders further argue that this Court may not make a finding of constructive trust because the Court would have to go outside the bounds of the Counterclaims to find the facts nec-

essary to impose a constructive trust, which the Court may not do in a motion to dismiss.

Sierra responds that it need not prove its right to a constructive trust in order to prevail on the Motion. It need only allege facts in its Complaint sufficient to support its claim to a constructive trust.

The Court agrees with Sierra. Arguments concerning whether a constructive trust should be imposed are properly brought as a defense to Sierra's Complaint (the Lenders did so in their affirmative defenses), or through a motion to dismiss Sierra's Complaint.

### 2. *Avoidance of Constructive Trust*

■ The Lenders assert in Count IX of their Counterclaims that any constructive trust in favor of Sierra would be avoidable by the Debtors under the strong arm powers of section 544(a)(1) of the Code. *See e.g., Mullins v. Burtch (In re Paul J. Paradise Assocs.),* 249 B.R. 360, 367 (D.Del.2000) (holding that section 544(a)(3) may be used to avoid a constructive trust); *Loewen Group Int'l, Inc.,* 292 B.R. 522, 527 (Bankr.D.Del.2003) (applying *Paradise* to avoid a constructive trust).

Sierra disagrees. It argues that the Debtors may not avoid its constructive trust because the Refund was never part of the Debtors' estate. *See, e.g., In re Columbia Gas Sys., Inc.,* 997 F.2d 1039, 1054, 1059 (3d Cir.1993). Sierra asserts that the Debtors do not hold legal or equitable title to the Refund. Even if the Debtors did hold legal title, Sierra contends that neither the Debtors nor the Lenders can avoid the assignment of the Refund under the strong arm powers of section 544. Sierra asserts that *Paradise* is distinguishable because it relied on section 544(a)(3) which applies to the avoid-

ance of an unperfected lien on *real estate.*[4] The instant case implicates section 544(a)(1), which relates to avoidance of a constructive trust on *personal property.*

Courts disagree whether section 544 may be used to avoid a constructive trust on personal property. *See, e.g., Mayer v. United States (In re Reasonover),* 236 B.R. 219, 227 (Bankr.E.D.Va.1999) (discussing the split of authority over whether section 544 is trumped by section 541(d), which provides that property in which the debtor holds only legal, not equitable, title is not property of the estate). *Compare City Nat'l Bank of Miami v. Gen. Coffee Corp. (In re Gen. Coffee Corp.),* 828 F.2d 699 (11th Cir.1987) (holding that section 544 may not be used to avoid a constructive trust); *Vineyard v. McKenzie (In re Quality Holstein Leasing),* 752 F.2d 1009 (5th Cir.1985) (same) *with Belisle v. Plunkett,* 877 F.2d 512 (7th Cir.1989) (allowing section 544 to be used to avoid a constructive trust); *Elliott v. Frontier Props. (In re Lewis W. Shurtleff, Inc.),* 778 F.2d 1416 (9th Cir.1985) (same); *Turoff v. Sheets (In re Sheets),* 277 B.R. 298 (Bankr. N.D.Tex.2002) (same); *Bank of Alex Brown v. Goldberg (In re Goldberg),* 158 B.R. 188 (Bankr.E.D.Cal.1993) (addressing avoidance of proceeds held in a constructive trust).

However, the law in this Circuit is clear. The Third Circuit held in *Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.,* 960 F.2d 366, 372 n. 2 (3d Cir.1992), that "Section 541(d)'s limitation on the scope of the bankruptcy estate prevails over the trustee's strong-arm powers under section 544 of the Code." As this Court explained in *In re DVI, Inc.*:

> While the status of a hypothetical lien creditor as of the petition date may create a lien in real property, it does not

---

**4.** Similarly, *Loewen* dealt with section 544(a)(3), not section (a)(1). 292 B.R. at 527.

automatically create a lien in personal property.... Therefore, it would not be superior to a constructive trust claim on personal property. Even if the Debtors did obtain a lien on personal property under section 544(a)(1) or (2), that lien would arise only as of the petition date. Since the constructive trust arises when the wrong occurs ... it is superior to the Debtors' rights because it is first in time.

306 B.R. 496, 503 (Bankr.D.Del.2004). Therefore, under existing precedent, a constructive trust in personal property cannot be avoided under section 544(a)(1). *Id.*

The question of whether Sierra's interest in the Refund can be avoided turns on whether a trust can be established. Because the Court reserved this question above, the determination of the avoidance issue will be reserved until trial. The Court notes, however, that should a constructive trust be established, the Debtors could not avoid such a trust because it is imposed on personal property, not real estate. As a result, the Court will not dismiss Counts VII and IX of the Lenders' Counterclaims.

### 3. *Superior Security Interest*

 In Count VIII of the Lenders' Counterclaims, they seek a declaratory judgment that their interest in the Refund is superior to any interest Sierra could assert. They assert that their security interest was granted in March 1998 before Sierra received an Assignment of the Refund and was confirmed in the Cash Collateral Order.

Sierra seeks to dismiss this claim arguing that the Lenders had no interest in the Refund because the Debtors never had an interest in the Refund. Sierra asserts that the Assignment merely confirmed the right which Sierra has under the SPA to any overpayment of taxes made by it. Thus, Sierra argues that the Lenders' security interest never attached to the Refund. N.Y. U.C.C. Law § 9–203(b)(2).

Further, Sierra argues that the Lenders were not given a superior interest in the Refund by their Security Agreement because it expressly excluded any property of the Debtors that was otherwise encumbered. Sierra asserts that the Cash Collateral Order could not give the Lenders any interest in the Refund because the Debtors had no rights in the Refund. (Sierra also notes that the Cash Collateral Order did not grant the Lenders any interest in avoidance actions.)

The Lenders argue, in response, that the Debtors received the escrow funds from Sierra and held them in a bank account for ten days before transferring them to Massachusetts. This was sufficient, the Lenders assert, for their security interest to attach. *See, e.g., Young v. Farmingdale Food Market, Inc. (In re Lasercad Reprographics, Ltd.),* 106 B.R. 793, 798 (Bankr.S.D.N.Y.1989) (finding that title passes, and a security interest can attach, only when the funds are transferred out of escrow); *Hassett v. Blue Cross & Blue Shield of Greater N.Y. (In re O.P.M. Leasing Servs., Inc.),* 46 B.R. 661, 666–67 (Bankr.S.D.N.Y.1985) (holding that delivery of money from an escrow account divests the grantor of rights to the escrowed money).

Sierra disagrees. It asserts that the Lenders could not get a security interest in cash held in a bank account under Article 9 of the Uniform Commercial Code in effect at the time. *See* N.Y. U.C.C. Law § 9–104(1) (2000) (repealed 2001); *In re Interstate Dept. Stores, Inc.,* 128 B.R. 703, 705 (Bankr.N.D.N.Y.1991) (section 9–104 excepts from the reach of Article 9 the transfer of an interest in any deposit account); *In re O.P.M. Leasing,* 46 B.R. at

670 (holding that a security interest in money is perfected by possession).

Sierra further argues that, even if Article 9 was applicable, the Debtors' possession was too limited to constitute control. *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops,* 4 F.3d 90, 98 (1st Cir.1993) (holding that "mere possession" of a bailee does not amount to "rights in collateral" to which a security interest can attach); *Eastman Kodak Co. v. Harrison (In re Sitkin Smelting & Ref., Inc.),* 639 F.2d 1213, 1215–17 (5th Cir. 1981) (distinguishing bailments—as possessory—from actual rights in the collateral and holding that a bailment is insufficient to create rights in the collateral).

Alternatively, the Lenders contend that their security interest extends to proceeds, and the Refund qualifies as a proceed. Sierra also disputes this point, arguing that in order for collateral to qualify as a proceed, it must flow from the Debtors' property. It argues that the Refund flowed from Sierra's property, not the Debtors. Furthermore, Sierra asserts that in order for proceeds to be covered by a security interest, the underlying collateral must be acquired by a debtor before the commencement of the bankruptcy proceeding. *See, e.g., Northeastern Copy Servs., Inc. v. Bridgeport Park Assocs. (In re Northeastern Copy Servs., Inc.),* 175 B.R. 580, 583 (Bankr.E.D.Pa.1994) (holding that a pre-bankruptcy perfected security interest in proceeds will only apply post-petition if the debtor had rights in the collateral pre-petition and the property fits within the relevant state law definition of proceeds). Sierra reasons that because Massachusetts did not determine the amount of the Refund prior to the petition date, the Debtors acquired an interest in the Refund post-petition. *In re Gross–Feibel Co.,* 21 B.R. 648, 650 (Bankr.S.D.Ohio 1982) (holding that for a security interest

to attach to a refund, "it must appear that debtor had a right to the refunds prior to the filing of the petition.") The Lenders argue, however, that the Cash Collateral Order gave them an interest in post-petition collateral, namely "all rights to payment including tax refund claims."

For the Lenders to assert a plausible claim for priority under New York law, they need to plead facts showing that the Debtors had an interest in the collateral to which their security interest could attach. N.Y. U.C.C. Law § 9–203. To determine if the Lenders have stated a claim, the Court must determine if the collateral could have been subject to the Security Agreement and whether the Debtors could have had an interest in the collateral. In doing so, the Court must accept as true the Lenders' factual allegations and any reasonable inferences that can be drawn from them. *Langford,* 235 F.3d at 847. To grant the Motion to Dismiss, there must be no set of facts on which the Lenders could get relief. *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99.

The Court concludes that the Lenders cannot establish that their security interest is superior. As found above, the Assignment confirmed the parties' rights under the SPA: namely that the Debtors had no property interest in the Refund. Further, the Assignment states "the [Debtors] intend to receive and *hold in trust* for the benefit of [Sierra] the whole or any portion of a refund...." (Assignment at p. 2 (emphasis added).) Whether this creates a trust or a bailment is irrelevant: under either form, the Debtors never had a right to the Refund. They may not pledge as collateral property in which they have no rights. Therefore, the Lenders' security interest did not attach and they cannot state a claim that their interest in the escrow funds has a higher priority than Sierra's. Consequently, the Court will

grant the Motion to Dismiss Count VIII of the Lenders' Counterclaims.

## IV. *CONCLUSION*

For the reasons set forth above, the Court will grant the Motion to Dismiss Counts I, II, III, IV, and VI of the Debtors' Counterclaims and deny the Motion to Dismiss Count V. Further, the Court will deny the Motion to Dismiss Counts V, VII and IX of the Lenders' Counterclaims and grant the Motion to Dismiss Counts I, II, III, IV, VI and VIII.

An appropriate order is attached.

## ORDER

AND NOW this **25th** day of **AUGUST, 2005,** upon consideration of the Motions to Dismiss filed by Sierra Investments, LLC against SHC, Inc., the Committee of Unsecured Creditors, and Bank of America, N.A. as agent for the secured lenders, and the responses thereto, and as set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Motion to Dismiss Counts I, II, III, IV, and VI of the Counterclaims of the Debtors and the Committee is **GRANTED,** and it is further

**ORDERED** that the Motion to Dismiss Count V is **DENIED,** and it is further

**ORDERED** that the Motion to Dismiss Counts I, II, III, IV, VI, and VIII of the Counterclaims of Bank of America is **GRANTED,** and it is further

**ORDERED** that the Motion to Dismiss Counts VII and IX is **DENIED.**